LAKE BEULAH MANAGEMENT DISTRICT,
Petitioner-Appellant-Cross-Respondent,

LAKE BEULAH PROTECTIVE AND
IMPROVEMENT ASSOCIATION,
Co-Petitioner-Co-Appellant-Cross-Respondent,

v.

STATE of Wisconsin Department of
Natural Resources, Respondent-Respondent,

VILLAGE OF EAST TROY, Intervening-Respondent-
Respondent-Cross-Appellant.†

Court of Appeals

*No. 2008AP3170. Oral argument January 20, 2010.
—Decided June 16, 2010.*

2010 WI App 85

(Also reported in 787 N.W.2d 926.)

† Petition for review granted 11-5-10.

222

223

On behalf of the petitioner-appellant-cross-respondent, the cause was submitted on the brief of and oral argument by *Dean P. Laing* of *O'Neil, Cannon, Hollman, DeJong, S.C.*, of Milwaukee.

On behalf of the co-petitioner-co-appellant-cross-respondent, the cause was submitted on the brief of *William T. Stuart* of *Meissner Tierney Fisher & Nichols, S.C.*, of Milwaukee.

A combined reply brief of petitioner-appellant-cross-respondent and co-petitioner-co-appellant-cross-respondent was filed by *Dean P. Laing* of *O'Neil, Cannon, Hollman, DeJong, S.C.*, and *William T. Stuart* of *Meissner Tierney Fisher & Nichols, S.C.*

On behalf of the respondent-respondent, the cause was submitted on the brief of and oral argument by *Judith M. Ohm* of the Bureau of Legal Services, Madison.

On behalf of the intervening-respondent-respondent-cross-appellant, the cause was submitted on the briefs of and oral argument by *Paul. G. Kent* of *Anderson & Kent, S.C.*, of Madison.

Before Brown, C.J., Neubauer, P.J., and Anderson, J.

225

¶ 1. BROWN, C.J. This decision explores the interplay between the public trust doctrine and the regulation of high capacity wells, especially when citizens or conservancy organizations such as lake management districts perceive that a proposed well may adversely affect nearby navigable waters. We will go through our analysis in some detail, but for purposes of this introductory statement, it is enough to say the following: The statutes identify three types of water wells, differentiated by the quantity of water they consume—wells consuming 100,000 gallons per day (gpd) or less, wells consuming over 2,000,000 gpd and wells in-between. This case has to do with wells in-between. The parties dispute the role that the public trust doctrine plays with regard to the middling wells. The Village of East Troy says that, with certain statutorily defined exceptions, there is no role. Lake Beulah Management District and Lake Beulah Protective and Improvement Association claim that there is always a role such that the DNR is mandated to thoroughly investigate each proposed middling well for possible public trust doctrine implications. The DNR agrees with the District and the Association that the doctrine always plays a role but asserts that the comprehensiveness of the investigation is solely at its discretion. We agree with the DNR, but we also hold that the DNR misused its discretion here. We therefore reverse and remand with directions that the circuit court remand this case to the DNR for further proceedings. We also affirm a side issue and a cross-appeal.

## BACKGROUND

¶ 2.　The procedural and factual history of the high capacity well at issue here—Well #7—goes back to 2003 when the Village first applied for and received a now-expired permit from the DNR. We relate this history in detail.

226

¶ 3. In 2003, the Village wanted to add a fourth well to its municipal water supply "to eliminate current deficiencies and supplement for future growth." The Village chose a site for the well which was approximately 1400 feet from the shores of Lake Beulah, an 834-acre lake located in Walworth county, and determined that Well #7 would have a 1,440,000 gpd capacity. As part of its application to the DNR, the Village submitted an April 2003 report that its consultant prepared. Based upon analysis of pump test data, the report "estimated that a well producing [1,440,000 gpd] would avoid any serious disruption of groundwater discharge to Lake Beulah."

¶ 4. The DNR then issued the permit via a letter dated September 4, 2003. The letter stated the DNR's conclusion: "It is not believed that the proposed well will have an adverse effect on any nearby wells owned by another water utility." And it included an excerpt from the Village's consultant which contained the consultant's opinion that Well #7 "would avoid any serious disruption of groundwater discharged to Lake Beulah." The 2003 permit was valid for two years and required the Village to submit a new application if it did not commence construction or installation of the improvements within those two years.

¶ 5. On October 3, 2003, just short of one month after the DNR issued the 2003 permit, the Lake Beulah Management District petitioned for a contested case before the DNR, alleging that the DNR "failed to comply with . . . [its] responsibility to protect navigable waters, groundwater and the environment as a whole" in issuing the permit to the Village. The District wanted the DNR to independently consider the environmental effects before approving the permit. The DNR denied the petition later that month on the basis that it lacked the

authority to consider the environmental concerns which the District presented.

¶ 6. But about three months later, on January 13, 2004, the DNR changed its mind and granted a contested case hearing on the issue of whether the DNR "should have considered any potentially adverse effects to the waters . . . when the [DNR] granted a conditional approval of the plans and specifications for proposed Municipal Well No. 7 in the Village of East Troy." The Village responded on March 26, 2004, by filing a motion for summary disposition with the administrative law judge (ALJ). The Village argued that the DNR lacked the statutory authority to consider the environmental effects because Well #7 is not located in a place where the Wisconsin statutes specifically mandate environmental review prior to permit approval. At this point in the procedural history, even though the DNR had reversed course and granted a contested case hearing, it still held the same view as the Village on the scope of the DNR's authority over wells. The Lake Beulah Protective and Improvement Association then successfully intervened and has been allied with the District ever since. We will hereafter refer to the two entities as one—the conservancies.

¶ 7. On June 11, 2004, the ALJ presiding over the contested case granted the Village's motion and agreed with the Village that "because the statute requires that the [DNR] consider certain impacts . . . the statute should be construed to exclude consideration of other factors." The ALJ also commented that even if what the conservancies contended was true (that in some cases the DNR may have a "basis other than the express statutory standards for reconsidering the preliminary approval in a contested case proceeding"), Well #7 was

not such a case because the conservancies failed to present any "scientific evidence" that the well would have an adverse effect.

¶ 8. On July 16, 2004, the conservancies filed a petition for judicial review of the 2003 permit. During the briefing for that petition, the DNR reversed its prior position and concluded that "it has authority under certain circumstances to consider the Public Trust Doctrine in its analysis of high capacity well approvals" and that it can "condition or limit a high capacity well approval where operation of the well has negative impacts on public rights in navigable waters."[1] The DNR also stated, however, that it had no duty to consider environmental impacts in the instant matter because no one presented it with any evidence that the "operation of the Village's high capacity well approval would adversely impact Lake Beulah." On June 24, 2005, the circuit court, the Honorable James L. Carlson presiding, dismissed the petition and affirmed the ALJ's decision and reasoning.

¶ 9. On August 4, 2005, the conservancies moved for reconsideration and filed the affidavit of Robert Nauta, a Wisconsin licensed geologist. The conservancies also served the motion and affidavit on the attorneys for the DNR and the Village. The affidavit stated, inter alia, that Nauta had reviewed the Village

---

[1] The public trust doctrine is rooted in our state constitution and provides that the state holds title to navigable waters in trust for public purposes. WISCONSIN CONST. art. IX, § 1, states in pertinent part:

> [T]he river Mississippi and the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways and forever free, as well to the inhabitants of the state as to the citizens of the United States, without any tax, impost or duty therefor.

consultant's 2003 report and other reports concerning the Lake Beulah area, and had installed his own test wells and conducted surface water studies relating to the hydrology of Lake Beulah. Though he had a limited amount of time to review and conduct those studies, he concluded that the Village's consultant reached erroneous findings about the water table and the aquifer's condition and the consultant's tests were "inadequately designed and improperly conducted." He also opined that the consultant's brief test did confirm a lowering of groundwater and wetland water levels, and thus, given the specific hydrology of Lake Beulah and its surrounding environs, the tests results "clearly demonstrate potential for adverse impacts to Lake Beulah." He therefore reasoned that Well #7 "would cause adverse environmental impacts to the wetland and navigable surface waters of Lake Beulah."

¶ 10. The circuit court denied the conservancies' motion for reconsideration. The conservancies then appealed to this court. We dismissed the appeal in an order dated June 28, 2006, because the 2003 permit had expired and, as we explain next, the DNR had issued another permit in 2005 for Well #7. Therefore, the appeal was moot. *See Lake Beulah Lake Mgmt. Dist. v. DNR*, Nos. 2005AP2230 & 2005AP2231, unpublished slip op. (WI App June 28, 2006).

¶ 11. The record shows that, while litigation over the 2003 permit ensued, the Village applied to "extend" its 2003 permit for two additional years because it had not yet started building and the 2003 permit would expire on September 4, 2005. With its application, the Village submitted the $500 application fee and information demonstrating that the physical circumstances were unchanged from the 2003 application. On September 6, 2005, the DNR granted the Village a two-year

"extension" of the 2003 permit, concluding that Well #7 complied with the groundwater protection law.[2] The DNR mailed to the conservancies a copy of the 2005 permit (still addressed to the Village), which included the thirty-day appeal deadline.

¶ 12. On March 3, 2006, nearly six months after the 2005 permit was issued and while the appeal concerning the 2003 permit was still pending, the conservancies filed a petition for review of the 2005 permit. The petition restated many of the concerns it expressed in the litigation over the 2003 permit, namely that Well #7 would adversely affect the quantity of water available to maintain the water level of Lake Beulah and that the DNR failed to consider Well #7's effect on Lake Beulah. The conservancies requested that the circuit court "remand[] the matter to the DNR for reconsideration of the [2005] approval to include consideration of its Public Trust Doctrine obligations to protect the navigable waters of Lake Beulah and its connecti[ng] waterways."

¶ 13. On September 23, 2008, the circuit court, the Honorable Robert J. Kennedy presiding, denied the petition and held that (1) the 2005 permit was a "new"

---

[2] After the 2003 approval but before the Village requested the 2005 approval, the Wisconsin legislature enacted a new groundwater protection law. *See* 2003 Wis. Act 310, §§ 5–12. The new law became effective on May 7, 2004, and mandated that the DNR conduct environmental review of additional wells near specified water resources. *Id.*; *see* Wis. Stat. § 281.34(4) (2007–08). The Village's proposed well was not located such that the new law specifically included it in the category of wells for which it mandated environmental review. We will explain the relevant details of the new law in our discussion.

All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

permit (not an extension); (2) the DNR had a right to consider the public trust doctrine to determine whether a high capacity well, regardless of its size, will negatively impact the waters of the State; (3) if the DNR had a "solid, affirmative indication" that waters of the state would be "significantly harmed" or "adverse[ly] affect[ed]," then the DNR should consider the information and possibly conduct further studies; and (4) there was "an absolute dearth of any proof," so the DNR did not fail its obligation to protect the waters of the state. The circuit court also assumed, without deciding, that the conservancies' petition for judicial review was timely. The conservancies then brought this appeal.

## DISCUSSION

■

¶ 14. We start our discussion by briefly addressing a side issue.[3] The conservancies argue that the 2005 permit was a "nullity" because the DNR: (1) had

_____

[3] There is also an issue brought by the Village via a cross-appeal. The Village argues that the conservancies had only thirty days to file their petition for review and yet they waited nearly six months, making the conservancies' petition untimely. But in *Habermehl Electric, Inc. v. DOT*, 2003 WI App 39, ¶ 18, 260 Wis. 2d 466, 659 N.W.2d 463, we held that the thirty-day rule found in Wis. Stat. § 227.53(1)(a)2. does not apply to noncontested cases and, instead, the six-month "default limitation" applies. The petition for review on appeal is not based on a decision in a contested case. So the six-month time limit applies. The petition was timely.

In so concluding, we decline the Village's request to distinguish or criticize *Habermehl Electric* and the two other cases reaching the same conclusion, *Collins v. Policano*, 231 Wis. 2d 420, 605 N.W.2d 260 (Ct. App. 1999), and *Hedrich v. Board of Regents of University of Wisconsin System*, 2001 WI App 228, 248 Wis. 2d 204, 635 N.W.2d 650. Unless or until *Habermehl* is

nothing to extend since the DNR's approval came two days after the 2003 permit expired and (2) could not grant a "new" permit since the Village applied for an *extension* of the 2003 permit, not a *new* permit. But the facts are to the contrary. In 2005 the DNR received an application from the Village for a new approval of Well #7. The application included information demonstrating that the physical circumstances were unchanged from the 2003 application. And the Village paid an application fee of $500—the same as it would if applying for a new permit. *See* Wis. Stat. § 281.34(2). Regardless of how the Village labeled its application, and regardless of how the DNR labeled its approval, the fact is that the DNR received the application with the required fee for a "new" permit, determined that the circumstances remained unchanged since the original 2003 approval and that the proposed well complied with the new groundwater law promulgated between the 2003 permit and the 2005 permit, and based on that determination, granted a new permit. Inasmuch as the DNR had a new fee and had to review the application in consort with new legislation, the DNR issued a new permit and its conduct comported with it being a new permit. The 2005 permit is not a nullity.

---

reversed or modified by our supreme court, it remains the law and we will follow it. *See City of Sheboygan v. Nytsch*, 2008 WI 64, ¶ 5, 310 Wis. 2d 337, 750 N.W.2d 475 ("It is well settled that the court of appeals may not overrule, modify or withdraw language from a previously published decision of the court of appeals."). Further, no supreme court case, including *Waste Management of Wisconsin, Inc. v. DNR*, 149 Wis. 2d 817, 440 N.W.2d 337 (1989), reaches a conflicting conclusion about the time limit in Wis. Stat. § 227.53(1)(a)2. *See Cuene v. Hilliard*, 2008 WI App 85, ¶ 15, 312 Wis. 2d 506, 754 N.W.2d 509 ("To the extent that a supreme court holding conflicts with a court of appeals holding, we follow the supreme court's pronouncement.").

¶ 15. With that side issue disposed of, we can now concentrate on setting the table to discuss the major issues at hand. Central to the DNR's grant of the 2005 permit was its conclusion that the facts had not changed since the 2003 permit.[4] But that is not altogether true. The record shows that, before the DNR granted the 2005 permit, its attorney of record in the 2003 permit proceedings had new information: the affidavit from the conservancies' expert, Robert Nauta.[5] During oral argument, we asked the DNR's attorney of record in this case, who was also the same attorney of record in the 2003 case, whether the Nauta affidavit had come to the attention of the DNR permit decision makers. She replied that it had not. We asked whether

---

[4] The Village sent the DNR a letter from its engineer stating that the conditions were unchanged. And the DNR accepted that in its review for compliance with the groundwater protection act that came into effect after it issued the 2003 permit.

[5] During oral argument, the conservancies also pointed to three other pieces of information they claim the DNR had before the 2005 approval but did not consider. These include: (1) an April 2003 report from the Village's engineering firm, which we referenced early during our recitation of the facts surrounding the 2003 approval; (2) a June 3, 2003 e-mail from the United States Geological Survey's Daniel Feinstein stating that his interpretation of the Village engineer's 2003 report was that the test well had an effect of drawing down the water levels; and (3) a June 28, 2003 letter from Philip Evenson of the Southeastern Wisconsin Regional Planning Commission, which states that the commission staff agree with the District's concern regarding the potential for negative impacts on the wetlands and Lake Beulah itself from the proposed well, but that the current information is insufficient to estimate whether the negative impacts would be significant. It is unclear whether the DNR had this information, however, with the exception of the 2003 report from the Village's expert. So when we refer to the Nauta affidavit, we refer to the information that the DNR had but did not consider.

she thought she had a duty to convey this information to the decision makers and she said she did not. She contended that it was the conservancies' obligation to bring this affidavit to the attention of the permit decision makers and that the conservancies had failed to do so. So, in her view, the DNR did not have any new information and the DNR therefore was not specifically alerted to a possible public trust doctrine problem such that it should have investigated the permit claim more fully before issuing it.

¶ 16. The facts and circumstances provided in our rendition of the background, along with the information gained by way of oral argument, raise several questions: Does the DNR have a duty to investigate public trust doctrine concerns with regard to middling wells? If so, what is that duty? If there is a duty, does that duty arise on a case-by-case basis or is it present in every case involving a high capacity well? If the duty exists only case by case, how is this duty triggered and what information is necessary? What process must citizens and conservancy groups employ to bring the triggering information to the DNR's attention? Regardless of the normal process, since this information came to the DNR attorney's attention in the 2003 case, does the attorney-client imputation rule apply such that if an attorney for the DNR had new facts in a legal file, the DNR should be held to have had such knowledge in its agency record when the agency record concerns the same underlying matter as the legal file? Those are the issues we now address.

*High Capacity Wells and
the Duty to Consider the Public Trust Doctrine*

¶ 17. The Village claims that the DNR is precluded by statute from considering the public trust

implications of Well #7. In other words, the Village claims that the DNR has no duty. This requires us to examine the relevant statutes in detail. There are four statutes at issue here: two statutes provide a broad, general grant of authority to the DNR—WIS. STAT. §§ 281.11 and 281.12—and two statutes create specific rules for high capacity wells—WIS. STAT. §§ 281.34 and 281.35.[6] Since we are construing statutes involving the scope of an agency's power, we give no deference to the agency's opinion. *Grafft v. DNR*, 2000 WI App 187, ¶ 4, 238 Wis. 2d 750, 618 N.W.2d 897. Nor do we defer to the circuit court. *See Moonlight v. Boyce*, 125 Wis. 2d 298, 303, 372 N.W.2d 479 (Ct. App. 1985). Instead, we interpret these statutes de novo. *Grafft*, 238 Wis. 2d 750, ¶ 4.

¶ 18. The general statutes explain, inter alia, that the DNR "shall have general supervision and control over the waters of the state"[7] and "shall carry out the planning, management and regulatory programs necessary for implementing the policy and purpose of [WIS. STAT. ch. 281]." WIS. STAT. § 281.12(1). The policy and purpose section states that the DNR

> *shall* serve as the central unit of state government to *protect, maintain and improve the quality and manage-*

---

[6] These are the statutes that the legislature created or updated in 2003 Wis. Act 310, §§ 5–12, which comprise the new groundwater protection law that became effective in 2004.

[7] "Waters of the state" means

those portions of Lake Michigan and Lake Superior within the boundaries of this state, and all lakes, bays, rivers, streams, springs, ponds, wells, impounding reservoirs, marshes, watercourses, drainage systems *and other surface water or groundwater, natural or artificial, public or private, within this state or its jurisdiction.*

WIS. STAT. § 281.01(18) (emphasis added).

*ment of the waters of the state, ground and surface, public and private* . . . . The purpose of this subchapter is to *grant necessary powers* and to organize a comprehensive program under a single state agency for the enhancement of the quality management and protection of all waters of the state, ground and surface, public and private. To the end that these vital purposes may be accomplished, this subchapter . . . shall be *liberally construed in favor of the policy objectives set forth* in this subchapter.

WIS. STAT. § 281.11 (emphasis added).

■

¶ 19. We interpret these general statutes as expressly delegating regulatory authority to the DNR necessary to fulfill its mandatory duty "to protect, maintain and improve the quality and management of the waters of the state, ground and surface, public and private." *See id.*; *see also Karow v. Milwaukee Cnty. Civil Serv. Comm'n*, 82 Wis. 2d 565, 570, 263 N.W.2d 214 (1978) (the word "shall" is generally construed as imposing a mandatory duty). That these general statutes do not mention wells in particular does not mean that the statutes do not grant the DNR the authority to control or regulate wells by considering environmental factors relevant to protecting, maintaining and improving waters of the state. After all, wells have everything to do with waters of the state—they withdraw groundwater, one type of water which comprises the definition of waters of the state—therefore, the DNR necessarily has authority over them. *See* WIS. STAT. § 281.01(18) (defining waters of the state).

¶ 20. But we must construe statutes in the context in which they are used, considering surrounding and closely related statutes. *State ex rel. Kalal v. Circuit Court for Dane Cnty.*, 2004 WI 58, ¶ 46, 271 Wis. 2d

633, 681 N.W.2d 110. The Village argues that the specific statutes relating to wells create a comprehensive statutory framework within which the DNR can protect waters of the state, and thus, the Village contends that WIS. STAT. §§ 281.11 and 281.12 are general grants of authority which are superseded by specific statutes regulating wells. The essence of the Village's assertions is that the specific statutes, WIS. STAT. §§ 281.34 and 281.35, represent the legislature's policy decision that the protections provided in §§ 281.34 and 281.35 are sufficient to satisfy the DNR's duties to protect the waters of the state, and so any authority the DNR might previously have had from §§ 281.11 and 281.12 to regulate wells was overridden by the legislature's enactment of §§ 281.34 and 281.35. We now consider §§ 281.34 and 281.35.

¶ 21. These specific statutes classify wells into three categories: (1) wells with a capacity of less than or equal to 100,000 gpd, (2) wells with a capacity of more than 100,000 gpd and less than or equal to 2,000,000 gpd in any thirty-day period, and (3) wells with a capacity of more than 2,000,000 gpd in any thirty-day period. *See* WIS. STAT. § 281.34(1)(b) (defining a high capacity well as one with a capacity of more than 100,000 gpd); WIS. STAT. § 281.35(4)(b) (providing a second threshold level at more than 2,000,000 gpd in any thirty-day period and, therefore, creating three categories of wells).

¶ 22. WISCONSIN STAT. §§ 281.34 and 281.35 also provide the DNR with guidance about when environmental review[8] is required for certain wells within the

---

[8] WISCONSIN STAT. §§ 281.34 and 281.35 require the DNR to use the environmental review process found in the Wisconsin Environmental Policy Act (WEPA), WIS. STAT. § 1.11. *See also*

second category and all wells within the third category. In the second category, which we have referred to above as the "middling wells," § 281.34(4) requires that the DNR conduct environmental review in only three instances. Those instances are if the proposed well will: (1) be located in a groundwater protection area, (2) result in a water loss of more than ninety-five percent of the amount of water withdrawn, or (3) potentially have a significant environmental impact on a spring. *Id.* For the third category, § 281.35(4)(b) and (5)(d) require the DNR to determine that the proposed well will not adversely affect public water rights in navigable waters and will not conflict with any applicable plan for future uses of the waters of the state.

¶ 23. For the remaining wells, WIS. STAT. §§ 281.34 and 281.35 are silent as to whether the DNR may review or consider the well's potential environmental effects. The only guidance given to the DNR is the mandate in § 281.34(2) that "[a]n owner shall apply to the department for approval before construction" of a well over 100,000 gpd (a high capacity well). The statute gives no specifics on what the application entails (except for a $500 fee) or what standards, if any, the DNR may or must use when deciding whether to approve or deny permits for wells between 100,000 and 2,000,000 gpd, such as the well here.[9] *See id.*

WIS. ADMIN. CODE ch. NR 150 (the DNR's procedures for implementing WEPA). These statutes also authorize the DNR to require an applicant for approval of a high capacity well to submit an environmental impact report. Secs. 281.34(5) and 281.35(4)(b).

[9] We also note that the statutes provide no guidance on whether the DNR has the authority to regulate wells under 100,000 gpd when necessary to protect, maintain or improve

¶ 24. As we alluded to earlier, the Village interprets this silence in the presence of a comprehensive scheme to regulate high capacity wells as tacitly revoking any other authority the DNR might have over other wells, including its general authority to protect waters of the state. Well #7 is one of those "other wells." The Village's position goes so far as to argue that WIS. STAT. §§ 281.34 and 281.35 limit the DNR's authority to consider *anything* not specifically listed in that scheme before approving a high capacity well permit. It interprets the statutes to prohibit the DNR from enacting any regulations that would constrict wells, including WIS. ADMIN. CODE ch. NR 812. As we interpret the Village's argument, if taken to its logical conclusion, the DNR would be prevented from, for example, requiring permit seekers to use certain construction methods when building a well, *see, e.g.,* WIS. ADMIN. CODE § NR 812.11, and preventing permit seekers from placing waste in a well, *see* WIS. ADMIN. CODE § NR 812.05.

¶ 25. The public trust doctrine is such an important and integral part of this state's constitution that, before we can accept the Village's argument, there should be some evidence that the legislature intended by these statutes to render nugatory the more general statutes bestowing the DNR with the general duty to manage the public trust doctrine. *See Columbia Hosp. Ass'n v. City of Milwaukee*, 35 Wis. 2d 660, 668–69, 151 N.W.2d 750 (1967). Outside of what the Village considers to be the plain intent of the statutes, the only evidence of legislative intent is that, *in 2007,* the legislature rejected an advisory committees recommendation to amend WIS. STAT. § 281.34 by adding to the list of enumerated circumstances always requiring the

waters of the state. Though that exact issue is not before us, the conclusion we reach today is relevant to that issue.

DNR to conduct a formal environmental review.[10] The immediate response to the Village's argument is that the legislature's actions after this permit was issued do not affect our analysis of the statutes and legislative history that existed at the time. *See Schaul v. Kordell*, 2009 WI App 135, 23 n.12, 321 Wis. 2d 105, 773 N.W.2d 454. And we have not found any legislative history suggesting that 2003 Wis. Act 310 was meant to *revoke* the DNR's general authority. But the more measured response is that the rejection of the advisory committee's suggestion proves nothing. The action of rejecting the idea of requiring formal environmental review in every instance gives us no guidance as to whether the DNR could investigate a middling well at its discretion. We conclude that there is no evidence that the legislature intended to revoke the general grant of authority to the DNR regarding these other wells.

¶ 26. Moreover, we underscore the legislature's *explicit* command that the DNR's authority be "liberally construed" in favor of protecting, maintaining and improving waters of the state. WIS. STAT. § 281.11; *see also Wisconsin's Envtl. Decade, Inc. v. DNR*, 85 Wis. 2d 518, 528–29, 271 N.W.2d 69 (1978) (interpreting the predecessor of § 281.11[11] and concluding that "in keeping with the broad authority conferred on the DNR and explicit legislative intent," the DNR's statutory authority should be broadly construed).

---

[10] *See* Wisconsin Groundwater Advisory Committee, *2007 Report to the Legislature,* § 2.2.4, available at http://dnr.wi.gov/org/water/dwg/gac/GACFinalReport1207.pdf (last visited June 1, 2010).

[11] The legislature renumbered WIS. STAT. § 144.025 (1975–76). The current WIS. STAT. § 281.11 applies the same statement of policy and purpose. *See* 1995 Wis. Act. 227 § 374 (Note).

¶ 27. We therefore conclude that, just because the legislature was silent about the DNR's role with regard to some of the middling wells, this does not mean that the legislature meant to abrogate the DNR's authority to intercede where the public trust doctrine is affected. We are even more confident in our conclusion when we consider that the DNR must grant a permit for construction of all middling wells. Why would an agency have to grant a permit if it did not have any reviewing authority over a well? The permit process has to be, as a matter of common sense, more than a mechanical, rubber-stamp transaction. It must mean that the DNR has authority to become involved whenever it sees a public trust doctrine problem. In fact, the Village's own well application included its engineer's well pump test data and conclusion that the well "would avoid any serious disruption to the groundwater discharge at Lake Beulah." We question why the Village thought it necessary to provide this data if it did not think the DNR could consider the public trust doctrine.

¶ 28. We are convinced that we have harmonized the statutes to avoid conflict and ensured that no statute is surplusage. *See Jones v. State*, 226 Wis. 2d 565, 575–76, 594 N.W.2d 738 (1999) (holding that specific statutes control general ones only when there is truly a conflict and courts are to harmonize statutes to avoid conflicts when a reasonable construction of the statutes permits that). We agree with the conservancies and the DNR and hold that the legislature's mandate that the DNR complete a formal environmental review for only certain wells does not prohibit or rescind the DNR's authority to review other middling wells under Wis. Stat. §§ 281.11 and 281.12. The DNR's mission must be to protect waters of the state from potential

threats caused by unsustainable levels of groundwater being withdrawn by a well, whatever type of well that may be.[12]

## Whether the DNR's Duty is Absolute

¶ 29. We have rejected the Village's contention that the DNR has no authority to act in this case. We likewise now reject the conservancies' completely opposite contention that the DNR was *required* to conduct a full and thorough environmental review. As our foregoing discussion makes plain, the fact that the DNR had the authority to consider environmental factors with regard to Well #7 does not mean that it was required to do so. We disagree with the conservancies' contention that the DNR *always* has a sua sponte *affirmative obligation* to consider a well's effect on the waters of the state regardless of whether the DNR is presented with any information suggesting that the well might have a negative effect. We agree with the DNR that it would bear an impossible and costly burden were we to adopt

---

[12] We can envision, however, circumstances where the DNR could exercise its authority under WIS. STAT. §§ 281.11 and 281.12 in a way that would conflict with the high capacity well statutes. For example, if the DNR were to ban all wells or require the same kind of environmental review for all wells, that action would seem to conflict with the high capacity well statutes for the same reason that we held the DNR's ban of sulfide mineral mining conflicted with the Mining Act. *See Rusk County Citizen Action Group, Inc. v. DNR*, 203 Wis. 2d 1, 552 N.W.2d 110 (Ct. App. 1996). But, for the reasons already stated, we conclude that there is no conflict between the statutes in interpreting the general statutes to provide the DNR the flexibility to consider the environmental effect of a well on waters of the state when deciding whether to approve, condition or deny a well permit.

243

the conservancies' reasoning. We further agree with the DNR that its public trust duty arises only when it has evidence suggesting that waters of the state may be affected by a well. If the law were that the DNR always had a duty to conduct environmental review for every well application, even if it had no information that the waters of this state would possibly be adversely affected by a well, then the legislature would have had little reason to have enacted the specific high capacity well statutes. Such a duty would render Wɪs. Sᴛᴀᴛ. §§ 281.34 and 281.35 largely surplusage, and we are to avoid interpreting statutes in such a way. *See Randy A.J. v. Norma I.J.*, 2004 WI 41, ¶ 22, 270 Wis. 2d 384, 677 N.W.2d 630.

¶ 30. The conservancies contend that, in spite of what the statutes say about high capacity wells, there is common law authority mandating that the DNR, as the trustee of our state's waterways, has an absolute sua sponte duty to investigate every high capacity well proposal to see whether it will harm waters of the state. This is incorrect. The DNR is not an independent arm or a fourth branch of government; it is a legislatively created agency. *Kegonsa Joint Sanitary Dist. v. City of Stoughton*, 87 Wis. 2d 131, 143–44, 274 N.W.2d 598 (1979). As such, the DNR has only those powers which are expressly conferred by or which are necessarily implied from the *statutes* under which it operates. *See Oneida Cnty. v. Converse*, 180 Wis. 2d 120, 125, 508 N.W.2d 416 (1993). The public trust doctrine found in our state constitution does not have any self-executing language authorizing the DNR to do anything—the statutes do that. So the authority and duty that the conservancies claim the DNR has ("to investigate and determine whether the operation of [Well #7] will have

a significant negative impact on Lake Beulah") must come from state statutes.[13] We conclude that there is no requirement mandating the DNR to do a full examination of every well to see if the public trust doctrine is affected.

*How this Duty is Triggered*

¶ 31. The DNR asserts that the type of evidence necessary to trigger the DNR's duty to investigate public trust concerns with regard to wells like Well #7 is what the ALJ presiding over the June 2004 contested case termed as "scientific evidence" of a likely adverse impact to Lake Beulah from the Village's well. We do not have the expertise to say exactly what kind of evidence will prompt the DNR to further investigate a well's adverse environmental impacts or to condition or deny a well permit. There is no standard set by statute or case law. But we do have case law which recognizes that the DNR has particular expertise when it comes to water quality and management issues. *See Wisconsin's Envtl. Decade, Inc.*, 85 Wis. 2d at 529–30. The DNR is the central unit of state government in charge of water quality and management matters. *Id.* We will leave it to the DNR to determine the type and quantum of evidence that it deems enough to investigate. But, certainly, "scientific evidence" suggesting an adverse affect to waters of the state should be enough to warrant further, independent investigation.

---

[13] We are not suggesting that the DNR can ignore common law interpreting the agency's authority, nor that the public trust doctrine has no bearing on the interpretation of its statutory authority.

*How Citizens Can Present Evidence*
*to the DNR Regarding the*
*Environmental Impact of a Well*

¶ 32. The DNR posits that concerned citizens who
want to affect the decisions of DNR permit decision
makers have three options. Two options allow citizens
to submit information in a way that requires consider-
ation of the new information: (1) presenting the infor-
mation to the permit decision makers while the permit
process is ongoing or (2) if the permit has already been
granted, requesting a contested case hearing and, at
this hearing, present the information. The third option
is to petition for judicial review after the DNR has
issued the permit. However, under this option, the
concerned citizen may not be able to submit new
information.[14] The DNR suggests that a contested case
is the proper way to present information after it has
issued a permit because a contested case hearing pro-
vides an opportunity for every party, including con-
cerned citizens, to rebut or offer countervailing evi-

_____

[14] A concerned citizen may be able to use WIS. STAT. § 227.56
during a petition for judicial review to present evidence that the
court would use to determine whether to remand to the agency
for further fact-finding. *See State Public Intervenor v. DNR*, 171
Wis. 2d 243, 245–46, 490 N.W.2d 770 (Ct. App. 1992). Under this
statute, a citizen can apply "to the circuit court for leave to
present additional evidence on the issues in the case," and the
circuit court has the discretion to admit the additional evidence
upon such terms as it may deem proper if the person presenting
the evidence shows to the satisfaction of the court that the
additional evidence is material and that there were good reasons
for failure to present it in the proceedings before the agency. Sec.
227.56(1). The conservancies, however, did not use § 227.56 to
get their information to the DNR.

dence.[15] At the conclusion of the testimony, the hearing examiner may then decide whether there is sufficient evidence of a potential adverse impact and, if so, may issue specific orders to the DNR.

¶ 33. The DNR is further of the view that, if the permit is not challenged under any of the three foregoing options, then a concerned citizen's only remaining option, if he or she has information that a well is adversely impacting the public trust, is to bring a nuisance action against the permit holder under *State v. Deetz*, 66 Wis. 2d 1, 13, 224 N.W.2d 407 (1974). *See also* WIS. STAT. § 30.294. Or, once the permit has been granted, if the agency itself decides that the well is adversely affecting waters of the state, then it can bring a WIS. STAT. § 30.03 action to alter the permit approval.

■

¶ 34. We generally agree with the DNR and hold that these are the procedures commonly used to give information to the DNR decision makers and to challenge the ultimate decision. We also agree with the DNR that the conservancies did not use these proce-

---

[15] The DNR did not explain or cite any authority at oral argument about how exactly concerned citizens would go about submitting information at a contested case hearing which was not before the permit decision makers at the time the permit decision was made. We note that WIS. STAT. § 227.45 discusses evidence in contested cases and mandates that the "agency or hearing examiner shall admit all testimony having reasonable probative value" and is specifically required to exclude only evidence that is "immaterial, irrelevant or unduly repetitious testimony" or evidence that is inadmissible under a statute relating to HIV testing. *Rutherford v. LIRC*, 2008 WI App 66, ¶¶ 21–22, 309 Wis. 2d 498, 752 N.W.2d 897. WISCONSIN STAT. § 227.44(3) also mandates that all parties shall be afforded the opportunity "to present evidence and to rebut or offer countervailing evidence."

dures to submit their information. The conservancies did not present information *to* the permit decision makers that would have flagged Well #7 as possibly affecting a navigable waterway, either before issuance of the 2005 permit, at a contested case hearing on the 2005 permit, or by using WIS. STAT. § 227.56 to supplement the record during the 2005 petition for judicial review, as we described in the footnote. So, all things being equal, the conservancies would be out of court.

## *How the Attorney-Client Relationship Applies to this Case*

¶ 35. But all things are not equal here. The facts show that the DNR did have the conservancies' information, albeit not presented in the way described above. The conservancies presented the Nauta affidavit to the DNR's attorney on August 4, 2005, as part of the litigation on the 2003 permit. This was little more than one month before the DNR issued the 2005 approval. The affidavit directly challenged the Village consultant's conclusion and the DNR's resultant decision that Well #7 would not seriously disrupt groundwater flow to Lake Beulah. However, the DNR argues that since the evidence was presented to its attorney during litigation on a prior permit and was not provided to its decision makers regarding the instant permit, the Nauta affidavit was not part of the "agency record" and therefore did not require its consideration. Thus, even though the attorney represented the decision makers on both the 2003 and 2005 permit challenges and therefore knew there was an affidavit calling into question the efficacy of Well #7, the attorney contends that the decision makers did not have the information since it was not in the right file. Because the decision makers did not consider the affida-

vit, they were able to conclude when issuing the 2005 permit that there had been no change since 2003.

¶ 36. As a general rule, however, the knowledge of an attorney acquired while acting within the scope of the client's authority is imputed to the client. *See Suburban Motors of Grafton, Inc. v. Forester*, 134 Wis. 2d 183, 192–93, 396 N.W.2d 351 (Ct. App. 1986). "In the context of an enduring attorney-client relationship, knowledge acquired by the attorney is imputed to the client as a matter of law." 7 AM. JUR. 2D *Attorneys at Law* § 153 (2010) (footnote omitted); *see also Wauwatosa Realty Co. v. Bishop*, 6 Wis. 2d 230, 236, 94 N.W.2d 562 (1959). The presumption is that the attorney will communicate the information to the client; the fact that the attorney has not actually communicated his or her knowledge to the client is immaterial. 7 AM. JUR. 2D *Attorneys at Law* § 153 (2010); *Wauwatosa Realty Co.*, 6 Wis. 2d at 236–37.

¶ 37. For the purposes of the imputation rule, the DNR attorney's clients were the DNR employees making the permit decisions. The attorney was an "in-house" attorney employed by the state and assigned to handle legal matters for the litigation over the 2003 and 2005 Well #7 permits. At oral argument, the attorney stated that everything in the 2003 application file would also be in the 2005 file; she had to have known that the 2003 case was linked to the 2005 permit decision and that any information submitted during litigation over the 2003 permit was relevant to the decision makers' consideration of the 2005 permit application. We thus rule that anything in the DNR's attorney file for the litigation concerning Well #7 is imputed to the DNR employees making the decisions

regarding the permit for Well #7. It follows, therefore, that the attorney file is part of the agency record for the 2005 permit approval, regardless of whether the DNR's attorney actually gave the Nauta affidavit to the decision makers, because it concerns the same parties and the same precise contested issue.

¶ 38. And frankly, we are a bit perplexed as to why the DNR attorney did not show the affidavit to the decision makers when she presumably consulted with them after the conservancies filed their motion for reconsideration. The conservancies gave *her* the affidavit a mere day after the Village applied to *her* to extend its permit. And the affidavit directly contradicted the previous evidence before the DNR about Well #7's environmental impacts. It should have occurred to her that the Nauta affidavit was relevant to the Village's request and that the affidavit was a factual change requiring the consideration of the DNR's decision makers. Attorneys are supposed to share information with their clients. *See* SCR 20:1.4(1). One of the benefits of having people with different expertise in an agency is that they can *communicate* and *pool information* and thus be more efficient and responsive to the general public for whom they ultimately work. The DNR provides no reason why the decision makers did not have that Nauta affidavit in the formal "agency record" when its attorney had it in a legal file on the same underlying matter.[16]

---

[16] As a practical matter, the situation whereby the DNR's own attorney represents the agency in a case such as this is unique. Normally, the Department of Justice has the duty to represent the DNR pursuant to Wis. Stat. § 165.25. However, the DOJ refused to represent the DNR in the instant case because it disagreed with the DNR's grant of both the 2003 and 2005 permits. Thus, the agency's own attorney was the attorney of record for the DNR. The attorney-client discussion here,

¶ 39. Since we have concluded that the DNR had a duty to consider the information from a scientist that the proposed well "would cause adverse environmental impacts to the wetland and navigable surface waters of Lake Beulah," we reverse and remand to the circuit court with directions to, in turn, remand this case to the DNR so that it may consider the Nauta affidavit and any other information the agency had pertinent to Well #7 before it issued the 2005 approval.

¶ 40. No costs to either party on appeal.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions.

therefore, may be limited to the facts of this case. This is not to say that it cannot be applied in future cases. It is only to say that courts will have to look closely at the facts and circumstances in each case.