LAKE BEULAH MANAGEMENT DISTRICT,
Petitioner-Appellant-Cross-Respondent,

LAKE BEULAH PROTECTIVE AND
IMPROVEMENT ASSOCIATION,
Co-Petitioner-Co-Appellant-Cross-Respondent,

v.

STATE of Wisconsin Department
of Natural Resources,
Respondent-Respondent,

VILLAGE OF EAST TROY,
Intervening-Respondent-Respondent-Cross-
Appellant-Petitioner.

Supreme Court

*No. 2008AP3170. Oral argument April 13, 2011.
Decided July 6, 2011.*

2011 WI 54

(Also reported in 799 N.W.2d 73.)

For the intervening-respondent-respondent-cross-appellant-petitioner Village of East Troy there were briefs by *Paul G. Kent and Barbara A. Neider, Stafford Rosenbaum LLP,* Madison and oral argument by *Paul G. Kent.*

For the petitioner-appellant-cross-respondent Lake Beulah Management District there was a brief by *Dean P. Laing, O'Neil, Cannon, Hollman, DeJohg & Laing S.C.,* Milwaukee and oral argument by *Dean P. Laing.*

For the co-petitioner-co-appellant-cross-respondent Lake Beulah Protective and Improvement Association there was a brief by *William T. Stuart, Meissner Tierney Fisher & Nichols, S.C.*

For the respondent-respondent State of Wisconsin Department of Natural Resources there was a brief by *Carl A. Sinderbrand, Axley Brynelson, LLP* and *Judith M. Ohm, Wisconsin Department of Natural Resources* and oral argument by *Carl A. Sinderbrand.*

There was an amicus brief by *Andrew C. Cook, Robert I Fassbender* and *Great Lakes Legal Foundation, Inc.,* Madison, on behalf of Attorneys for Dairy Business Association, Midwest Food Producers Association, Wisconsin Manufactures & Commerce, and Wisconsin Paper Council.

There was an amicus brief by *Michael D. Dean* and *First Freedoms Foundation, Inc.,* Waukesha and *Theodore Hadzi-Antich* and *Pacific Legal Foundation,* Sacramento on behalf of Pacific Legal Foundation.

There was an amicus brief by *Thomas D. Larson* and *Wisconsin Realtors Association,* Madison on behalf of Wisconsin Realtors Association and the Wisconsin Builders Association.

There was an amicus brief by *Jodi Habush Sinykin* and *Elizabeth Lawton* and *Midwest Environmental Advocates,* Madison on behalf of Wisconsin Wildlife Federation, River Alliance of Wisconsin and Clean Wisconsin.

There was an amicus brief by *Claire Silverman* and *League of Wisconsin Municipalities,* Madison and *Brian G. Formella* and *Anderson, O'Brien, Bertz, Skrenes & Golla,* Stevens Point on behalf of Wisconsin Rural Water Association, Inc.

There was an amicus brief by *Henry E. Koltz* and *Schmidt, Darling & Erwin,* Milwaukee, on behalf of Wisconsin Trout Unlimited, Inc.

There was a nonparty brief by *William P. O'Connor* and *Mary Beth Peranteau* and *Wheeler, Van Sickle & Anderson, S.C.* on behalf of Wisconsin Association of Lakes.

¶ 1. N. PATRICK CROOKS, J. This is a review of a published decision of the court of appeals[1] involving

---

[1] *Lake Beulah Mgmt. Dist. v. Dep't of Natural Res. (DNR),* 2010 WI App 85, 327 Wis. 2d 222, 787 N.W.2d 926.

the Wisconsin Department of Natural Resources' (DNR) decision to issue a permit to the Village of East Troy (the Village) for a municipal well, Well No. 7, on September 6, 2005. Well No. 7 was constructed and began operating on August 1, 2008.[2] The Lake Beulah Management District (LBMD) and the Lake Beulah Protective and Improvement Association (LBPIA), referred to collectively as the conservancies, challenged the DNR's decision to issue the 2005 permit without considering the well's potential impact on nearby Lake Beulah, a navigable water. The Walworth County Circuit Court, the Honorable Robert J. Kennedy presiding, denied the petition for review, concluding that, while the DNR had some duty to consider the impact of proposed wells on waters of the state, the DNR did not violate its obligations by issuing the 2005 permit because there was no evidence that the well would harm Lake Beulah. The conservancies appealed.

¶ 2. The court of appeals held that the DNR has the authority and duty to consider the environmental impact of a proposed high capacity well if presented with sufficient scientific evidence suggesting potential harm to waters of the state.[3] The court of appeals concluded that the DNR was presented with such evidence in this case and remanded to the circuit court to order the DNR to consider the impact of Well No. 7 on Lake Beulah.[4]

---

[2] *Lake Beulah Mgmt. Dist. v. Vill. of E. Troy*, 2010 WI App 127, ¶ 3, 329 Wis. 2d 641, 791 N.W.2d 385.

[3] *Lake Beulah Mgmt. Dist. v. DNR*, 327 Wis. 2d 222, ¶¶ 25–27, 31.

[4] *Id.*, ¶ 39.

¶ 3. We conclude that, pursuant to Wis. Stat. § 281.11, § 281.12, § 281.34, and § 281.35 (2005–06),[5] along with the legislature's delegation of the State's public trust duties,[6] the DNR has the authority and a general duty[7] to consider whether a proposed high capacity well may harm waters of the state.[8] Upon what evidence, and under what circumstances, the DNR's general duty is implicated by a proposed high capacity well is a highly fact specific matter that depends upon what information is presented to the DNR decision makers by the well owner in the well permit application and by citizens and other entities regarding that permit application while it is under review by the DNR.

¶ 4. We further hold that to comply with this general duty, the DNR must consider the environmental impact of a proposed high capacity well when presented with sufficient concrete, scientific evidence of potential harm to waters of the state. The DNR should use both its expertise in water resources management and its discretion to determine whether its duty as

---

[5] All subsequent references to the Wisconsin Statutes are to the 2005–06 version unless otherwise indicated.

[6] Wis. Const. art. IX, § 1.

[7] We use "general duty" to describe the DNR's broad obligation to protect waters of the state, which does not demand that the DNR take any particular action unless that duty is triggered by a proposed high capacity well permit application.

[8] " 'Waters of the state' includes those portions of Lake Michigan and Lake Superior within the boundaries of this state, and all lakes, bays, rivers, streams, springs, ponds, wells, impounding reservoirs, marshes, watercourses, drainage systems and other surface water or groundwater, natural or artificial, public or private, within this state or its jurisdiction." Wis. Stat. § 281.01(18).

54

■■■■■■■■

trustee of public trust resources is implicated by a proposed high capacity well permit application, such that it must consider the environmental impact of the well or in some cases deny a permit application or include conditions in a well permit.

¶ 5. Thus, we affirm that part of the court of appeals decision holding that the DNR has the authority and a general duty, which it described as something less than an absolute duty, to consider the impact of a proposed high capacity well on waters of the state.[9] We further affirm the court of appeals' conclusion that this general duty requires the DNR to investigate or consider potential harm to waters of the state only when such duty is triggered, and that there are limited ways in which citizens may present evidence of potential harm to the DNR.[10]

¶ 6. However, we reverse that part of the court of appeals decision that reversed and remanded to the circuit court with directions to remand to the DNR. That part of the court of appeals decision was based on the court of appeals' conclusion that the DNR's duty was triggered in this case by the conservancies' submission of an affidavit by geologist Robert J. Nauta (the Nauta affidavit) to the DNR's in-house attorney regarding a related proceeding.[11] The court of appeals assumed that the DNR's attorney was not one of the decision makers and used the principles of attorney-client imputation—imputing the DNR attorney's possession of the Nauta affidavit to the DNR decision makers—to conclude that the decision makers had this information while reviewing the 2005 permit application

[9] *Lake Beulah Mgmt. Dist. v. DNR,* 327 Wis. 2d 222, ¶¶ 17–30.

[10] *Id.,* ¶¶ 29–34.

[11] *Id.,* ¶¶ 35–39.

and to include it in the record on review.[12] The record is silent regarding who the DNR decision makers were and whether they actually had the Nauta affidavit while reviewing the 2005 permit application. Based on the lack of information on these matters in the record on review, we must reverse the court of appeals decision to remand to the circuit court with directions to remand to the DNR.

¶ 7. We note that the right to review of the DNR's decision regarding a high capacity well permit application "is dependent upon strict compliance with [Wis. Stat. ch. 227]."[13] "Ch. 227 provides a comprehensive, fully defined, procedure for judicial review of administrative decisions."[14] In a challenge to a DNR decision, "[d]eveloping a factual record . . . is essential, because [§ 227.57] limits judicial power over administrative decisions to review of the agency's actions, based on the record developed before the agency."[15] In this case, based on the record on review, which does not include the Nauta affidavit, the DNR was not presented with sufficient concrete, scientific evidence of potential harm to waters of the state, and thus, we affirm the DNR's decision to issue the 2005 permit.[16]

¶ 8. Therefore, we affirm in part and reverse in part the decision of the court of appeals.

---

[12] *Id.,* ¶¶ 34–38.

[13] *Cudahy v. Wis. Dep't of Revenue,* 66 Wis. 2d 253, 259, 224 N.W.2d 570 (1974); *see also Kegonsa Joint Sanitary Dist. v. City of Stoughton,* 87 Wis. 2d 131, 145, 274 N.W.2d 598 (1979).

[14] *Wis. Envtl. Decade, Inc. v. Pub. Serv. Comm'n (PSC),* 79 Wis. 2d 161, 170, 255 N.W.2d 917 (1977).

[15] *Charter Mfg. Co., Inc. v. Milwaukee River Restoration Council, Inc.,* 102 Wis. 2d 521, 527–28, 307 N.W.2d 322 (Ct. App. 1981).

[16] If such evidence of potential or actual harm is presented in the future concerning Lake Beulah, our decision does not

## I. FACTUAL BACKGROUND
## AND PROCEDURAL HISTORY

¶ 9. Well No. 7 has been the subject of extensive litigation, and the issues raised in this case are related to the conservancies' challenge to the 2003 permit. While only the DNR's decision regarding the 2005 permit is under review by this court, the history of and litigation involving the 2003 permit is relevant, and thus, is included herein.

¶ 10. In order to provide adequate drinking water to its growing number of residents, in 2003, the Village first applied to the DNR to construct a municipal well with a capacity of 1,400,000 gallons per day (gpd).[17] Along with its application and fee, the Village submitted reports from the consulting firm Crispell-Snyder, Inc., providing detailed specifications for the well and the results of its well site investigation. The report described the surrounding land use, the surface topography, the hydrogeology of the area, the location of potential contamination sources, the results of test pumping, and the location of nearby wetlands. This report also relied, in part, on an investigation by Layne-Northwest, another consulting firm the Village hired in 2000 to select a suitable site for its well.

¶ 11. On September 4, 2003, the DNR issued a letter to the Village granting it a permit to construct and operate Well No. 7, hereinafter referred to as "the 2003 permit." In this letter, the DNR relied on its conclusion that Well No. 7 would not "have an adverse effect on any nearby wells owned by another water

foreclose a remedy such as an enforcement or nuisance action. *See infra* ¶ 60 n.40.

[17] A well with this capacity qualifies as a high capacity well. Wis. Stat. § 281.34(1)(b).

utility." The DNR also included Layne-Northwest's opinion that Well No. 7, pumping at its full capacity, "would avoid any serious disruption of groundwater discharge to Lake Beulah." The 2003 permit provided that "[i]f construction or installation of the improvements has not commenced within two years the approval shall become void and a new application must be made and approval obtained prior to commencing construction or installation."

¶ 12. Well No. 7 is located 1,200 feet from Lake Beulah. Because of their concern about Well No. 7's potential impact on Lake Beulah and the surrounding environment, LBMD, later joined by LBPIA, referred to collectively as the conservancies, pursued an unsuccessful challenge to the DNR's 2003 permit decision; first, in a contested case hearing and later, through a petition for judicial review.[18] As a result of this litigation, the Village did not begin construction on Well No. 7 before the 2003 permit was set to expire and thus was required to apply to the DNR for another permit.

¶ 13. On August 3, 2005, the Village's attorney sent a letter to the DNR's attorney formally requesting an extension of the 2003 permit for an additional two years.[19] The Village asserted that no additional analysis

[18] See the court of appeals decision in this case for a detailed summary of the 2003 permit challenge. *See Lake Beulah Mgmt. Dist. v. DNR,* 327 Wis. 2d 222, ¶¶ 5–10.

[19] While the Village and the DNR treated the 2005 permit as an extension of the 2003 permit, in a decision relating to the 2003 permit, the court of appeals concluded that the 2005 permit was, in fact, a new permit. *Lake Beulah Lake Mgmt. Dist. v. Dep't of Natural Res. (DNR),* Nos. 2005AP2230 & 2005AP2231, unpublished slip op. at 2–3 (Wis. Ct. App. Jun. 28, 2006) (dismissing the appeal of the 2003 permit as moot because

was required because changes to Wis. Stat. § 281.34[20] did not affect this well, and thus, "neither the relevant law nor facts [had] changed since [the Village's] last application."

¶ 14. On August 4, 2005, the day after the Village formally requested a permit extension, the conservancies filed a motion for reconsideration of the circuit court's decision in the 2003 permit challenge, to which the conservancies attached the affidavit of Robert J. Nauta. The motion and affidavit were served on the DNR's in-house attorney in that case. In the affidavit, Robert J. Nauta, a Wisconsin-licensed geologist, stated that based on his analysis of the Village's consultants' pumping tests and reports and his own pumping tests and studies, "the existing data can only support the conclusion that pumping of proposed Well No. 7 would cause adverse environmental impacts to the wetland and navigable surface waters of Lake Beulah."

¶ 15. The DNR granted the permit "extension" in a letter dated September 6, 2005, hereinafter referred to as "the 2005 permit." The DNR agreed with the Village's assertion that the "physical circumstances" of Well No. 7 had not changed and that the issuance of a permit was appropriate under the standards in Wis. Stat. § 281.34 as modified by 2003 Wisconsin Act 310.

¶ 16. On March 3, 2006, the conservancies petitioned the Walworth County Circuit Court for judicial review of the DNR's decision to issue the 2005 permit.

the 2003 permit had expired and the Village had obtained a new permit).

[20] In 2004, the legislature passed 2003 Wisconsin Act 310, which created Wis. Stat. § 281.34 and imposed additional requirements on the DNR's review of certain categories of proposed wells with a capacity of between 100,000 and 2,000,000 gpd.

Relevant to this appeal, the conservancies argued that the DNR, pursuant to its public trust obligations, should have considered evidence of potential harm to Lake Beulah, a navigable water, before issuing the permit for Well No. 7.[21] In an oral decision on September 23, 2008, the circuit court, the Honorable Robert J. Kennedy presiding, denied the conservancies' petition. The circuit court agreed with the conservancies that "in the presence of some solid, affirmative indication that the waters of Lake Beulah, or the wells, or the surrounding area, et cetera, would be significantly harmed, this court agrees that the DNR should consider that information and even perhaps conduct further studies to confirm whether that is so or not."[22] Finding an "absolute dearth of any evidence suggesting that there would be harm to the lake or its environs," the circuit court concluded that the DNR did not fail to comply with its duty under the public trust doctrine by issuing the 2005 permit without any further investigation.

---

[21] In addition, the conservancies argued that the Village's 2005 permit was invalid because the Village requested a permit "extension," but was required to obtain a "new" permit. The conservancies also defended their petition as timely on the basis that they did not request a contested case hearing and filed within the six month limitation period for judicial review of agency decisions.

[22] For the purposes of its decision, the circuit court assumed that the conservancies' petition was timely and also noted that, contrary to the conservancies' argument, the 2005 permit was a valid "new" permit because the court of appeals, on review of the 2003 permit, so held in dismissing that appeal for mootness. *See Lake Beulah Lake Mgmt. Dist. v. DNR,* Nos. 2005AP2230 & 2005AP2231, at 2–3. Further, the circuit court held that the 2005 permit was valid because, even though the Village referred to it as a permit "extension" in its application, it met all of the statutory requirements for a new permit application.

¶ 17. The conservancies appealed, and the court of appeals reversed the circuit court's decision.[23] *Lake Beulah Mgmt. Dist. v. Dep't. of Natural Res. (DNR),* 2010 WI App 85, ¶ 1, 327 Wis. 2d 222, 787 N.W.2d 926. As an initial matter, the court of appeals agreed with the circuit court that the 2005 permit is not a "nullity" even though it is a new permit and was referred to as a permit "extension" in the 2005 permit application. *Id.,* ¶ 14. The court of appeals concluded that the 2005 permit application contained the information and fee required by Wis. Stat. § 281.34(2) for a new permit. *Id.*

¶ 18. The court of appeals went on to address the DNR's authority and duty under the public trust doctrine and Wis. Stat. ch. 281. The court of appeals concluded that the State delegated its duties under the public trust doctrine—to preserve for public use Wisconsin's navigable waters and the beds underlying such waters—to the DNR. *Id.,* ¶ 19; *see also* Wis. Const. art. IX, § 1.[24] Noting that the public trust doctrine was "an important and integral part of this state's constitution," the court of appeals reasoned that the legislature's delegation of its public trust duties to the DNR in one part of Wis. Stat. ch. 281 could be negated only by express language in the specific high capacity well provisions of that chapter. *Id.,* ¶ 25.

[23] The Village also cross-appealed the circuit court's decision that the conservancies' petition for judicial review was timely. The court of appeals agreed with the circuit court and held that the conservancies' petition was timely because it was not a petition for judicial review of a contested case and was filed within six months of the DNR's decision. *Lake Beulah Mgmt. Dist. v. DNR,* 327 Wis. 2d 222, ¶ 14 n.3.

[24] A detailed explanation of the public trust doctrine and its applicability to the high capacity well statutes is provided later in our analysis herein, *see infra* ¶¶ 29–33.

Finding no such language, the court of appeals held that the public trust doctrine together with Wis. Stat. § 281.11, § 281.12, § 281.34, and § 281.35, grant the DNR the authority and impose a general duty to review the environmental impacts of a proposed high capacity well, even if no formal environmental review is required by statute. *Lake Beulah Mgmt. Dist. v. DNR,* 327 Wis. 2d 222, ¶¶ 18–28.

¶ 19. The court of appeals further held that this duty is not absolute, but must be triggered by some showing that a proposed high capacity well has the potential to harm waters of the state. *Id.,* ¶¶ 29–31. Noting that "the DNR has particular expertise when it comes to water quality and management issues," the court of appeals left it to the DNR "to determine the type and quantum of evidence that it deems enough to investigate" potential harm to waters of the state. *Id.,* ¶ 31. The court of appeals concluded that, "certainly, 'scientific evidence' suggesting an adverse [effect on] waters of the state should be enough to warrant further, independent investigation." *Id.*

¶ 20. The court of appeals explained how citizens may present evidence to the DNR to trigger its duty to consider the effects of a proposed high capacity well on waters of the state. *Id.,* ¶¶ 32–34. First, citizens may present "the information to the permit decision makers while the permit process is ongoing." *Id.,* ¶ 32. Second, "if the permit has already been granted, [a party may] request[] a contested case hearing and, at this hearing, present the information." *Id.* Third, citizens may "petition for judicial review after the DNR has issued the permit." *Id.* Before a circuit court, however, citizens may present evidence only if the circuit court, in its discretion, grants a motion to supplement the record on review upon finding that the evidence is material and

there were good reasons for failing to present it to the agency. *Id.*, ¶ 32 n.14; *see* Wis. Stat. § 227.56(1).

¶ 21. The court of appeals concluded that, while the conservancies did not use any of the above methods, they did provide evidence to the DNR suggesting that Well No. 7 would harm waters of the state by submitting the Nauta affidavit to the DNR's in-house attorney, who was involved in the litigation of both permits. *Lake Beulah Mgmt. Dist. v. DNR,* 327 Wis. 2d 222, ¶¶ 34–35. Under the principles of attorney-client imputation, the court of appeals reasoned that any information that the DNR's attorney had regarding these permits while the 2005 permit application was under review would be imputed to the DNR decision makers.[25] *Id.*, ¶¶ 36–38. The court of appeals held that the DNR had this evidence when deciding whether to issue the 2005 permit, which triggered the DNR's duty to consider the impact of Well No. 7 on Lake Beulah. *Id.*, ¶ 39. Thus, the court of appeals reversed and remanded to the circuit court "with directions to, in turn, remand this case to the DNR so that it may consider the Nauta affidavit and any other information the agency had pertinent to Well [No. 7] before it issued the 2005 [permit]." *Id.*

¶ 22. The Village petitioned this court for review, which we granted. We first examine the scope of the DNR's authority and duty under the public trust doctrine and Wis. Stat. ch. 281 to consider the environmen-

---

[25] The court of appeals did not specify who the DNR decision makers for the 2005 permit were, and the record on review appears silent as to that point; nor did the DNR define that term. The court of appeals' analysis assumes, however, that the decision makers did not include the DNR's attorney to whom the conservancies submitted the Nauta affidavit. *See Lake Beulah Mgmt. Dist. v. DNR,* 327 Wis. 2d 222, ¶¶ 34–38.

tal effects of a proposed high capacity well on waters of the state before issuing a permit. We then examine whether the DNR's decision to issue the 2005 permit complied with its duty and all other statutory requirements.

## II. ANALYSIS

¶ 23. The question of the scope of an agency's authority requires the interpretation of relevant statutes, which presents a question of law, which we review de novo. *Andersen v. Dep't of Natural Res.*, 2011 WI 19, ¶ 25, 332 Wis. 2d 41, 796 N.W.2d 1. We afford one of three levels of deference to an agency's interpretation of a statute: great weight, due weight, or no deference. *Id.*, ¶ 26. When interpreting the scope of an agency's authority conferred by statute, we give no deference to the agency's interpretation of its own authority. *Id.*, ¶ 25. Because agencies are creatures of statute, they have "only those powers as are expressly conferred or necessarily implied from the statutory provisions under which [they] operate[]." *Brown Cnty. v. Dep't of Health & Soc. Servs.*, 103 Wis. 2d 37, 43, 307 N.W.2d 247 (1981).

¶ 24. When interpreting a statute, we begin by examining the language of the statute, and our analysis ends there if the meaning is plain. *State ex rel. Kalal v. Circuit Court for Dane Cnty.*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110. Statutory language is interpreted "in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." *Id.*, ¶ 46. This includes "the scope, context, and purpose" of the statute if

it is evident from the statutory language. *Id.*, ¶¶ 48–49. If our interpretation "yields a plain, clear statutory meaning," then the statute is unambiguous and we need not resort to other sources, such as legislative history, to aid our interpretation. *Id.*, ¶ 46.

██

¶ 25. Upon resolving the scope of the DNR's authority and duty, we reach the underlying dispute, which centers on the validity of DNR's decision to issue the 2005 permit. "When an appeal is taken from a circuit court order reviewing an agency decision, we review the decision of the agency, not the circuit court." *Hilton ex rel. Pages Homeowners' Ass'n v. Dep't of Natural Res.*, 2006 WI 84, ¶ 15, 293 Wis. 2d 1, 717 N.W.2d 166.

¶ 26. A legal challenge to an agency decision is governed by Wis. Stat. ch. 227 and is limited to the record on review. Wis. Stat. § 227.57(1); *Clean Wis., Inc. v. Pub. Serv. Comm'n,* 2005 WI 93, ¶¶ 35–36, 282 Wis. 2d 250, 700 N.W.2d 768. We separately review "disputed issues of agency procedure, interpretations of law, [and] determinations of fact or policy within the agency's exercise of delegated discretion." Wis. Stat. § 227.57(3). On matters left to an agency's exercise of discretion, we may not substitute our judgment for that of the agency and must give "due weight" to an agency's "experience, technical competence, and specialized knowledge . . . as well as discretionary authority conferred upon it." Wis. Stat. § 227.57(8), (10); *Barnes v. Dep't of Natural Res.,* 184 Wis. 2d 645, 662, 516 N.W.2d 730 (1994). If, however, we conclude that an "agency's exercise of discretion is outside the range of discretion delegated to the agency by law," we must reverse and remand the case to the agency. Wis. Stat. § 227.57(8). "The court must affirm the DNR's action unless it finds a ground for not doing so." *Barnes,* 184 Wis. 2d at 661.

A. The Scope of the DNR's Authority and Duty

¶ 27. The focus of the conservancies' challenge to the 2005 permit is their assertion that the DNR has both the authority and duty to consider the impact of a proposed high capacity well on waters of the state. To a certain extent, the DNR agrees. The DNR asserts that it has the authority and a general duty to consider the impacts of a proposed well on waters of the state when deciding whether to issue a permit though it asserts that this duty did not require the DNR to undertake its own environmental analysis or to deny the permit in this case. The DNR and the conservancies agree that this authority and duty derives from both the public trust doctrine and Wis. Stat. ch. 281.

¶ 28. Regarding the public trust doctrine, they argue that the State has delegated its duties as trustee of public trust resources to the DNR, and that this imposes a duty on the DNR to protect navigable waters. Further, they assert that the DNR's authority and duty is also derived from Wis. Stat. § 281.11 setting forth the purposes and policies of that subchapter, and in Wis. Stat. § 281.12, outlining the DNR's duties under that subchapter to protect and preserve waters of the state. They assert that nothing in the more specific statutory standards for high capacity wells in Wis. Stat. § 281.34 and § 281.35 revokes this broad grant of authority or limits the DNR's duty under the public trust doctrine. They note that the Village's narrow interpretation of the DNR's authority would lead to an absurd result where the DNR knew a proposed high capacity well would cause harm to waters of the state but had to issue the permit and wait to pursue remedies until after the harm occurred. The DNR asserts that after-the-fact remedies would not be sufficient to protect public trust resources. Finally, the DNR adds, in response to the

66

Village's argument to the contrary, that the DNR's long history of conducting public trust analyses provides sufficient standards and guidance for permitees.

¶ 29. The Village argues that the DNR does not have the authority to consider the effect of a proposed high capacity well on waters of the state or to reject a well permit application because of such concerns. The Village asserts that the specific statutory scheme set forth in Wis. Stat. § 281.34 and § 281.35 circumscribes the DNR's authority to conduct environmental reviews and limits it to only those proposed high capacity wells specifically enumerated in the statute (which do not include Well No. 7): certain wells with a capacity of between 100,000 and 2,000,000 gpd and all wells with a capacity of over 2,000,000 gpd. The Village argues that the legislative history of Wis. Stat. § 281.34 and § 281.35 indicates that this statutory scheme evinces a deliberate legislative choice to limit the DNR's authority. The Village asserts that this specific, limited grant of authority cannot be superseded by the public trust doctrine or the general policy provisions in Wis. Stat. § 281.11 and § 281.12. The Village argues that interpreting the DNR's authority so broadly would create a permit system without clear standards and would provide no guidance for permit applicants. The Village notes that concerns about the environmental impacts of high capacity wells may be addressed through (1) the DNR's enforcement authority under ch. 30, (2) the State's authority to address nuisance conditions caused by excessive water withdrawals, and (3) citizen nuisance actions.[26]

---

[26] The Village also asserts that the court of appeals decision raises separation of powers concerns because, according to the Village, the decision "has effectively added words" to the statute and abrogated legislative policy choices. We disagree with the

¶ 30. It is undisputed that Lake Beulah is a navigable water. Thus, we begin our analysis with the applicability of the public trust doctrine to the DNR's regulation of high capacity wells because "[w]hen considering actions that affect navigable waters in the state, one must start with the public trust doctrine, rooted in Article IX, Section 1 of the Wisconsin Constitution." *Hilton,* 293 Wis. 2d 1, ¶ 18. While originally derived from the Northwest Ordinance, the public trust doctrine emanates from the following provision of the Wisconsin Constitution: "[T]he river Mississippi and the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways and forever free." Wis. Const. art. IX, § 1.

¶ 31. This court has long confirmed the ongoing strength and vitality of the State's duty under the public trust doctrine to protect our valuable water resources. In *Diana Shooting Club v. Husting,* we explained the importance of a broad interpretation and vigorous enforcement of the public trust doctrine:

> The wisdom of the policy which, in the organic laws of our state, steadfastly and carefully preserved to the people the full and free use of public waters cannot be questioned. Nor should it be limited or curtailed by narrow constructions. It should be interpreted in the broad and beneficent spirit that gave rise to it in order that the people may fully enjoy the intended benefits. Navigable waters are public waters, and as such they should enure to the benefit of the public.

156 Wis. 261, 271, 145 N.W. 816 (1914).

Village's characterization of the court of appeals decision in that regard, and because this argument is inadequately developed, we do not address it further. *See State v. Johnson,* 2009 WI 57, ¶ 71, 318 Wis. 2d 21, 767 N.W.2d 207.

We reaffirmed this maxim in *Muench v. Public Service Commission* in our examination of the history and evolution of the public trust doctrine, which indicated a "trend to extend and protect the rights of the public to the recreational enjoyment of the navigable waters of the state." 261 Wis. 492, 499–508, 53 N.W.2d 514 (1952). We have further explained, "The trust doctrine is not a narrow or crabbed concept of lakes and streams. It appreciates such bodies of water as more than arteries for waterborne traffic." *Menzer v. Vill. of Elkhart Lake*, 51 Wis. 2d 70, 82, 186 N.W.2d 290 (1971).

¶ 32.　From this fundamental tenet of our constitution, the State holds the navigable waters and the beds underlying those waters in trust for the public. *Hilton*, 293 Wis. 2d 1, ¶ 18; *ABKA Ltd. P'ship v. Wis. Dep't of Natural Res.*, 2002 WI 106, ¶¶ 11–12, 255 Wis. 2d 486, 648 N.W.2d 854; *Wis. Envtl. Decade, Inc. v. Dep't of Natural Res. (DNR)*, 85 Wis. 2d 518, 526, 271 N.W.2d 69 (1978). "This 'public trust' duty requires the state not only to promote navigation but also to protect and preserve its waters for fishing, hunting, recreation, and scenic beauty. The state's responsibility in the area has long been acknowledged." *Wis. Envtl. Decade v. DNR*, 85 Wis. 2d at 526 (internal citations omitted).

¶ 33.　While it is primarily the State's duty to protect and preserve these resources, "[i]n furtherance of the state's affirmative obligations as trustee of navigable waters, the legislature has delegated substantial authority over water management matters to the DNR. The duties of the DNR are comprehensive, and its role in protecting state waters is clearly dominant." *Id.* at 527; *see also Hilton*, 293 Wis. 2d 1, ¶ 20; *ABKA Ltd. P'ship*, 255 Wis. 2d 486, ¶ 12 ("The legislature has delegated to the DNR broad authority to regulate under the public trust doctrine and to administer ch. 30.").

¶ 34. Particularly relevant to this case, and supporting the DNR's expansive duty in this regard, the *Wisconsin's Environmental Decade v. DNR* court cited several chapters of the statutes, which charge the DNR with managing water resources, and concluded that those statutes act as the State's delegation of its public trust duties to the DNR. 85 Wis. 2d at 527–28 (citing Wis. Stat. chs. 29, 30, 31, 33, 144 (1977)). This court further concluded that Wis. Stat. § 144.025(1), (2) (1977), which provides nearly identical language to that currently in Wis. Stat. § 281.11 and § 281.12, served as a legislative delegation of the State's public trust duties to the DNR, specifically regarding its authority to consider the public trust when regulating the chemical treatment of aquatic weeds and algae. *Wis. Envtl. Decade v. DNR,* 85 Wis. 2d at 527–28. Similarly, we conclude that, through Wis. Stat. § 281.11 and § 281.12, the legislature has delegated the State's public trust duties to the DNR in the context of its regulation of high capacity wells and their potential effect on navigable waters such as Lake Beulah. After examining the role of the public trust doctrine, we turn to the language of the relevant statutes.

¶ 35. The statutory scheme governing high capacity wells, in subchapter II of Wis. Stat. ch. 281, combines the DNR's overarching authority and duty to manage and preserve waters of the state with certain specific, minimum statutory requirements. Wisconsin Stat. § 281.11 provides:

> The department shall serve as the central unit of state government to protect, maintain and improve the quality and management of the waters of the state, ground and surface, public and private. . . . The purpose of this subchapter is to grant necessary powers and to orga-

nize a comprehensive program under a single state agency for the enhancement of the quality management and protection of all waters of the state, ground and surface, public and private. To the end that these vital purposes may be accomplished, this subchapter and all rules and orders promulgated under this subchapter shall be liberally construed in favor of the policy objectives set forth in this subchapter.

Wisconsin Stat. § 281.12(1) further sets forth the DNR's powers and duties under subsection II of Wis. Stat. ch. 281, "The department shall have general supervision and control over the waters of the state. It shall carry out the planning, management and regulatory programs necessary for implementing the policy and purpose of this chapter."

¶ 36. In subchapter II of Wis. Stat. ch. 281, the legislature has further directed the DNR to regulate high capacity wells. Wis. Stat. §§ 281.34–281.35. A high capacity well is one that "has a capacity of more than 100,000 [gpd]." Wis. Stat. § 281.34(1)(b). The owner of a proposed high capacity well must "apply to the [DNR] for approval before construction of a high capacity well begins."[27] Wis. Stat. § 281.34(2). While the statutes refer to the DNR's "approval" of a proposed high capacity well, the DNR's "approval" of a well is actually its decision to issue a permit, and we refer to it as such herein.

¶ 37. For wells with a capacity of between 100,000 and 2,000,000 gpd, the DNR must review the well permit application using the formal environmental review process in Wis. Stat. § 1.11 for those wells (1) "located in a groundwater protection area," (2) "with a water loss of

---

[27] The owner of a well that is not a high capacity well, i.e., one with a capacity of less than 100,000 gpd, must "notify the [DNR] of the location of [the] well . . . before construction of the well begins." Wis. Stat. § 281.34(1)(b), (3)(a).

more than 95 percent of the amount of water withdrawn," or (3) "that may have a significant environmental impact on a spring." Wis. Stat. § 281.34(4)(a). For certain wells in the above categories, depending upon the DNR's conclusions in the environmental review process, the DNR may issue a permit, may deny a permit, or may issue a permit with conditions to "ensure that the . . . well does not cause significant environmental impact," or, in the case of a public utility well, to "ensure that the environmental impact of the well is balanced by the public benefit of the well related to public health and safety." *See* Wis. Stat. § 281.34(5)(b)-(d).

¶ 38. For wells with a capacity of more than 2,000,000 gpd, the legislature has imposed significant additional requirements. Wis. Stat. § 281.35(4)(b), (5). Before issuing a permit for such a well, the DNR must determine, among other things, that "no public water rights in navigable waters will be adversely affected[,] . . . the proposed withdrawal and uses will not have a significant adverse impact on the environment and ecosystem[,] . . . [or] a significant detrimental effect on the quantity and quality of the waters of the state." Wis. Stat. § 281.35(5)(d).

¶ 39. We conclude that, through Wis. Stat. ch. 281, the legislature has explicitly provided the DNR with the broad authority and a general duty,[28] in part

---

[28] We use "general duty" to describe the DNR's broad obligation to protect waters of the state, which does not demand the DNR to take any particular action unless that duty is triggered by a proposed high capacity well permit application. Under this general duty, the DNR is required to consider the impact of a proposed high capacity well on waters of the state only if the DNR decision makers are presented with sufficient

through its delegation of the State's public trust obligations, to manage, protect, and maintain waters of the state.[29] Wis. Stat. §§ 281.11, 281.12; *see also Wis. Envtl. Decade v. DNR*, 85 Wis. 2d at 527–28. Specifically, for all proposed high capacity wells, the legislature has expressly granted the DNR the authority and a general duty to review all permit applications and to decide whether to issue the permit, to issue the permit with conditions, or to deny the application.[30] Wis. Stat. §§ 281.34(2), (4)-(5), 281.35(4)(b), (5). The high capacity well permitting framework along with the DNR's authority and general duty to preserve waters of the state provides the DNR with the discretion to undertake the review it deems necessary for all proposed high capacity wells, including the authority and a general duty to consider the environmental impact of a proposed high capacity well on waters of the state.[31]

concrete, scientific evidence that the proposed well poses potential harm to waters of the state. *See infra* ¶¶ 44–46.

[29] Because the DNR's authority and general duty derive from both the public trust doctrine, which protects navigable waters, and Wis. Stat. ch. 281, which protects waters of the state, we refer to the DNR's authority and general duty in regard to waters of the state, which encompasses both. *See* Wis. Stat. §§ 281.01(18), 281.11, 281.12; *see also Wis. Envtl. Decade v. DNR*, 85 Wis. 2d at 526–27.

[30] Whether the DNR has the authority to consider the environmental impact of proposed wells with a capacity of less than 100,000 gpd, for which only notification, under Wis. Stat. § 281.34(3), is required, is not before this court, and thus we do not decide that issue.

[31] Our conclusion is not affected by the argument advanced by the Great Lakes Legal Foundation (GLLF) in a letter recently submitted on behalf of the amici Dairy Business Association, Wisconsin Manufacturers & Commerce, Inc., Wisconsin Paper Council, Inc., and Midwest Food Processors Asso-

¶ 40. The parties agree that there is no require-
ment either for the formal environmental review in
Wis. Stat. § 281.34(4) nor for the detailed environmen-
tal findings in Wis. Stat. § 281.35(5) for Well No. 7
because it has a capacity of 1,400,000 gpd and does not
fall into any of the special categories in Wis. Stat.
§ 281.34(4) for which formal environmental review is
required. However, the Village argues that the "gradu-
ated permit framework" in Wis. Stat. § 281.34 and
§ 281.35 limits the DNR's authority to consider envi-
ronmental concerns to only those wells for which mini-

ciation, Inc. In its letter, the GLLF asserts that 2011 Wisconsin
Act 21, enacted on May 23, 2011, further circumscribes the
DNR's authority to consider environmental harm under Wis.
Stat. ch. 281. The GLLF relies on Wis. Stat. § 227.10(2m)—"No
agency may implement or enforce any standard, requirement,
or threshold, including a term or condition of any license issued
by the agency, unless that standard, requirement, or threshold
is explicitly required or explicitly permitted by statute . . . ."—
and Wis. Stat. § 227.11(2)(a)—limiting an agency's rule-making
authority to that "explicitly conferred on the agency by the
legislature," not including any "statement or declaration of
legislative intent, purpose, findings, or policy," or "the agency's
general powers or duties."

None of the parties argues that the amendments to Wis.
Stat. ch. 227 in 2011 Wisconsin Act 21 affect the DNR's
authority in this case. The DNR responds that Wis. Stat. ch. 281
does explicitly confer authority upon the DNR to consider
potential environmental harm presented by a proposed high
capacity well. The conservancies agree. The Village maintains
that the DNR lacks such authority under Wis. Stat. ch. 281 but
states that "Wis. Stat. § 227.10(2m) does not change the law as
it relates to the authority of the [DNR] to issue high capacity
well approvals under Wis. Stat. § 281.34." We agree with the
parties that 2011 Wisconsin Act 21 does not affect our analysis
in this case. Therefore, we do not address this statutory change
any further.

mum review standards are prescribed. The Village's interpretation of the high capacity well statutes would require the DNR to issue a permit when the minimum statutory requirements are met.

¶ 41. To the contrary, there is nothing in either Wis. Stat. § 281.34 or § 281.35 that limits the DNR's authority to consider the environmental impacts of a proposed high capacity well, nor is there any language in subchapter II of Wis. Stat. ch. 281 that requires the DNR to issue a permit for a well if the statutory requirements are met and no formal review or findings are required.

¶ 42. Indeed, the Village's interpretation conflicts with the permissive language in the statutes, which allow the DNR to exercise its discretion when deciding whether to issue a permit.[32] The legislature can, and in other contexts does, mandate that the DNR issue a permit when certain requirements are met,[33] but the legislature has not done so for high capacity well permits. Finding no language expressly revoking or

[32] *See, e.g.,* Wis. Stat. § 281.34(5) (providing in the "[s]tandards and conditions for approval" that, for certain wells, the DNR "may not [issue a permit for] the high capacity well unless" certain conditions are met or included in the permit, but not requiring the DNR to issue the permit if those conditions are met); § 281.35(5)(d) (providing in the "[g]rounds for approval" that "[b]efore [issuing a permit], the [DNR] shall determine all of the following," including certain environmental findings but not mandating permit issuance if the DNR does make such findings).

[33] *See, e.g.,* Wis. Stat. § 281.346(4s)(d)3. (providing that the DNR "shall issue a notice of coverage" under a general permit for a water withdrawal from the Great Lakes basin if certain statutory requirements are met); § 285.62(7) (providing that the DNR "shall issue the operation permit" for a stationary source of air pollution if the statutory requirements are met).

limiting the DNR's authority and general duty to protect and manage waters of the state, we conclude that the DNR retains such authority and general duty to consider whether a proposed high capacity well may impact waters of the state. *See e.g., Reuter v. Dep't of Natural Res.,* 43 Wis. 2d 272, 275–78, 168 N.W.2d 860 (1969); *Maple Leaf Farms, Inc. v. Dep't of Natural Res.,* 2001 WI App 170, ¶¶ 15–27, 247 Wis. 2d 96, 633 N.W.2d 720. This interpretation best harmonizes all of the high capacity well statutes and avoids potential conflicts between the statutes and with the State's delegation of its public trust duties. *See Beard v. Lee Enters., Inc.,* 225 Wis. 2d 1, 15, 591 N.W.2d 156 (1999) ("Apparently conflicting provisions of law should be construed so as to harmonize them and thus give effect to the leading idea behind the law.").

¶ 43. Contrary to the Village's argument, this does not create a permit system without standards. The Village's argument ignores the reality of how the DNR exercises its authority and complies with its duty within the statutory standards. As with many other environmental statutes, within the general statutory framework, the DNR utilizes its expertise and exercises its discretion to make what, by necessity, are fact-specific determinations.[34] General standards are common in environmental statutes and are included elsewhere in the high capacity well statutes. *See, e.g.,* Wis. Stat. § 281.35(5)(d)1. (requiring the DNR to make a finding

[34] Wisconsin courts recognize that the DNR is expected to utilize its expertise and experience to apply the general statutory framework to each proposal. *Clean Wis., Inc. v. Pub. Serv. Comm'n,* 2005 WI 93, ¶ 168, 282 Wis. 2d 250, 700 N.W.2d 768 (recognizing "the DNR's special expertise on environmental matters"); *State ex rel. Boehm v. Dep't of Natural Res.,* 174 Wis. 2d 657, 677, 497 N.W.2d 445 (1993) (according deference to the DNR's decision because "the DNR is the state agency

"[t]hat no public water rights in navigable waters will be adversely affected" before issuing a permit). The fact that these are broad standards does not make them non-existent ones.

¶ 44. We conclude that the meaning of these provisions is clear: the DNR has the authority and a general duty to consider potential environmental harm to waters of the state when reviewing a high capacity well permit application.[35]

¶ 45. The DNR's general duty certainly does not require the DNR to investigate the potential environmental harm of every high capacity well permit application or to undertake a formal environmental review for every application. Such an interpretation would be inconsistent with the legislature's decision to mandate that level of environmental review for only certain high capacity wells. Wis. Stat. §§ 281.34(4), (5), 281.35(5); *see also Rusk Cnty. Citizen Action Group v. Dep't of Natural Res.*, 203 Wis. 2d 1, 8–9, 552 N.W.2d 110 (Ct. App. 1996).

---

possessing staff, resources, and expertise in environmental matters" and is in the best position to evaluate environmental impacts).

[35] Because we conclude that the plain language of the relevant statutory provisions is clear, we need not examine the legislative history. *State ex rel. Kalal v. Circuit Court for Dane Cnty.*, 2004 WI 58, ¶ 46, 271 Wis. 2d 633, 681 N.W.2d 110. Additionally, we are not persuaded by the Village's argument that the legislative history indicates that, by expanding the minimum environmental review requirements for certain high capacity wells, the legislature intended to limit the DNR's authority to consider potential environmental harm to its review of and decision regarding permits for only those wells. We further reject the Village's argument because it is contradicted by the plain meaning of the statute.

¶ 46. However, given its general duty, the DNR is required to consider the environmental impact of a proposed high capacity well when presented with sufficient concrete, scientific evidence of potential harm to waters of the state. Upon what evidence, and under what circumstances, that duty is triggered is a highly fact-specific matter that depends upon the information submitted by the well owner in the well permit application and any other information submitted to the DNR decision makers while they are reviewing that permit application. The DNR should use both its expertise in water resources management and its discretion to determine whether its duty as trustee of public trust resources is implicated by a proposed high capacity well permit application such that it has an obligation to consider environmental concerns. This is consistent with the fact-specific determinations that the DNR often must make to comply with its obligations under other environmental statutes.[36]

¶ 47. The limited review available to those who wish to challenge the DNR's discretionary permitting decisions provides an additional restriction that limits when a court will hold that the DNR's duty required it to take further action when considering a particular high capacity well permit application. As outlined in greater detail below, a legal challenge to the DNR's decision under ch. 227 is limited to the record on review and is deferential to the DNR's expertise in this area. Thus, citizens must present any evidence of potential harm to the agency *before* the decision is made or risk losing the ability to challenge the DNR's discretionary decision based on such evidence.

---

[36] *See supra* ¶ 42 n.30.

## B. Application to This Case

¶ 48. The conservancies argue that the DNR had a duty to consider potential harm to waters of the state in this case because the conservancies provided the DNR with concrete, scientific evidence showing potential harm to Lake Beulah. The conservancies assert that they triggered the DNR's duty by submitting the Nauta affidavit,[37] which they argue contained such evidence, to the DNR while it was making its decision regarding the 2005 permit, and that the DNR violated its duty by not considering it. The conservancies note that on August 3, 2005, the Village formally requested an extension of the 2003 permit by submitting a letter to the DNR's in-house attorney on the 2003 permit challenge. On August 4, 2005, the conservancies served a motion for reconsideration of the circuit court's decision on the 2003 permit on that same DNR attorney. The Nauta affidavit was attached. The conservancies assert that the 2005 permit is invalid because the DNR had this evidence and was obligated to consider it but did not do so.

¶ 49. They assert that "the very unique factual circumstances" coupled with the "complex procedural history" of this permit, involving the same parties and legal issues, mean that even though they submitted it regarding the 2003 permit litigation, since the DNR actually had this information while making its decision

---

[37] The conservancies note that attached to the Nauta affidavit were a letter from the Southeastern Wisconsin Regional Planning Commission (SWRPC) and an email from the U.S. Geological Society, which raised other concerns about the report submitted by the Village's consultant and Well No. 7's impact on Lake Beulah. When we refer to the Nauta affidavit we refer to all of the evidence presented in that affidavit and the attachments thereto.

regarding the 2005 permit, it triggered the DNR's duty to consider it. Additionally, the conservancies assert that the Nauta affidavit became part of the record on review for the 2005 permit when they submitted it in a binder along with their brief and later moved the circuit court to supplement that record.[38]

¶ 50. On the result required in this case, the Village and the DNR agree. They assert that a remand is not warranted because the DNR's duty to consider potential harm to waters of the state was not triggered by the 2005 permit request based on the evidence in the record on review. They argue that challenges to DNR's permitting decisions under ch. 227 are limited to the record on review, which is not simply any information the DNR had, but only that information the DNR had when making its permit decision that the DNR compiles, certifies, and sends to the circuit court.

¶ 51. They assert that the Nauta affidavit is not part of the record on review in this case. They note that the conservancies could have, but did not, utilize one of

---

[38] In their brief and at oral argument the conservancies also argued that an order by the circuit court, in which the circuit court noted that the parties could rely on "any information shown by the record to have been known to the DNR before and after the issuance of the [2003] permit," effectively added this evidence to the record on review. We disagree with this characterization of the circuit court order because it reflects that the circuit court would consider only information in the record on review by referring to "information *shown by the record* to have been known to the DNR." (Emphasis added.) Additionally, this order is not properly before this court because it is not in the record but was provided as an appendix to LBMD's brief. *See State v. Kuhn*, 178 Wis. 2d 428, 439, 504 N.W.2d 405 (Ct. App. 1993) (noting that an appellate court is "limited by the record before [it] and cannot consider the extraneous material included in [a party's] appendix").

the following methods to add this evidence to the record on review: (1) through a contested case hearing regarding the 2005 permit, or (2) through a motion to supplement or correct the record on review in the circuit court. They further note that the conservancies submitted this affidavit to the circuit court attached to a brief; however, they did not properly move to supplement the record with this information because their motion to supplement did not refer to the Nauta affidavit. They argue that the court of appeals' use of agency imputation principles to remand based on evidence in the Nauta affidavit is improper because that argument goes to what information the agency decision makers may or may not have had, and not what is part of the record on review.

██ ██

¶ 52. As reflected by the parties' arguments, determining what information the DNR had when making its decision to issue the 2005 permit, which we may do only by examining the record on review, is critical to the result in this case. It is important to understand that the "record on review" is a term of art within the context of Wis. Stat. ch. 227. The record on review is "the original or a certified copy of the entire record of the proceedings in which the decision under review was made, including all pleadings, notices, testimony, exhibits, findings, decisions, orders and exceptions, therein . . . " that the agency submits to the circuit court. Wis. Stat. § 227.55. Simply stated, the record on review is that record actually compiled and certified by the agency, which it sends to the circuit court. In this case, the record on review consists of all of the documents that the DNR sent to the circuit court in the conservancies' challenge to the 2005 permit.

¶ 53. A challenge to an agency decision under Wis. Stat. ch. 227 is limited to the record on review in that proceeding. Wis. Stat. § 227.57(1); *Wis. Envtl. Decade, Inc. v. Pub. Serv. Comm'n (PSC)*, 79 Wis. 2d 161, 170, 255 N.W.2d 917 (1977). A court may consider evidence outside the record on review only "in cases of alleged irregularities in procedure before the agency." Wis. Stat. § 227.57(1); *see also Wis. Envtl. Decade v. PSC*, 79 Wis. 2d at 170.

¶ 54. Citizens have several options through which they may present evidence to influence an agency's decision and to have that information considered in a review of the decision.

¶ 55. First and foremost, in order to ensure that information will be considered by an agency in its decision making and will be included in the record on review, citizens should submit evidence to the agency decision makers while they are deciding what action to take. More specifically, in regard to proposed high capacity wells, we conclude that to trigger the DNR's duty to consider the impact of a well on waters of the state, citizens must present sufficient concrete, scientific evidence of potential harm to waters of the state directly to the DNR decision makers while they are considering the well permit application.

¶ 56. After the DNR makes its decision, citizens may petition the DNR for a contested case hearing. Wis. Stat. § 227.42(1). If the petition is granted, citizens may present evidence during the hearing, which becomes part of the record on review. Wis. Stat. §§ 227.44(3), 227.45(2).

¶ 57. Additionally, citizens also have a limited opportunity to add to the record on review before a circuit court upon making a successful petition for

judicial review. Wis. Stat. § 227.52. If the petitioners believe that the DNR had information that it should have, but did not, include in the record on review, they may ask the circuit court to correct the record on review by adding such information. Wis. Stat. § 227.55. The petitioners may also request leave to supplement the record on review with additional evidence if the "evidence is material and [] there were good reasons for failure to present it in the proceedings before the agency." Wis. Stat. § 227.56(1).

¶ 58. The Nauta affidavit is not in the record on review in this case. The conservancies assert that the DNR actually had this information while making its decision regarding the 2005 permit because they served the Nauta affidavit on the DNR's attorney related to the 2003 permit challenge while the DNR was reviewing the Village's 2005 permit application.[39] At this stage in the proceedings, this argument is of no avail.[40] Instead, before the circuit court, the conservancies could have asserted this argument in support of proper motions to

---

[39] The record on review does not include any information as to who the decision makers were regarding the 2005 permit. Thus, as did the court of appeals, we must assume that the DNR's in-house attorney, to whom the conservancies submitted the Nauta affidavit, was not a decision maker on the 2005 permit. *See Lake Beulah Mgmt. Dist. v. DNR*, 327 Wis. 2d 222, ¶¶ 34–38.

[40] For this reason, we do not address further the attorney-client imputation argument that was the basis for the court of appeals' decision to remand. *See Lake Beulah Mgmt. Dist. v. DNR*, 327 Wis. 2d 222, ¶¶ 35–39. An argument that the DNR attorney's knowledge and possession of the Nauta affidavit could be imputed to the agency decision makers considering the 2005 permit application is one to be addressed to a circuit court in motions to supplement or correct the record on review. We do not address the merits of such an argument because it does not

■■■■■■■

■■■■■■■

correct or supplement the record on review. *See* Wis. Stat. §§ 227.55, 227.56(1). The conservancies did not make such motions in regard to the Nauta affidavit, and therefore it was not included as part of the record on review.

¶ 59. During oral argument the conservancies asserted that they did move the circuit court to supplement the record on review with information that they submitted in a binder, along with their brief. However, the Nauta affidavit is not in the binder referred to in the conservancies' motion to supplement.[41] Thus, this motion to supplement could not have added the Nauta affidavit to the record on review.

---

provide a basis for an appellate court to supplement retroactively the record on review.

[41] The Nauta affidavit was included in a binder submitted along with LBMD's initial brief in support of its petition for review, dated May 1, 2008, when this case, No. 2006CV172, was pending along with two related matters, Nos. 2006CV673 and 2007CV674. This brief was apparently superseded by another brief submitted by LBMD, dated August 11, 2008, which references only the circuit court case that is at issue in this case, No. 2006CV172. Along with the August 11, 2008, brief, LBMD submitted a different binder of documents, which did not include the Nauta affidavit. It is clear from the documents referenced in LBMD's brief in support of its motion to supplement the record or take judicial notice that the motion to supplement referred to the binder submitted along with LBMD's August 11, 2008, brief, which does not contain the Nauta affidavit.

A letter by LBMD's attorney regarding the circuit court record to be sent to the court of appeals confirms that the binder containing the Nauta affidavit was not part of LBMD's motion to supplement the record. LBMD's attorney stated that "the papers listed at R. 18 [LBMD's May 1, 2008, brief], 19 [the binder containing the Nauta affidavit], and 20 do not relate to this case, and should remain in the Court's file in Consolidated Case Nos. 06–CV-673 and 07–CV-674."

84

¶ 60. Having clarified the importance of what is and what is not in the record on review in this case, we address the DNR's discretionary decision to issue the 2005 high capacity well permit to the Village. Since the evidence raised in the Nauta affidavit is not part of the record on review, pursuant to Wis. Stat. § 227.57(1), we may not use the information in that affidavit as a basis to reverse the DNR's decision.

¶ 61. We conclude that the DNR properly exercised its discretion and complied with the law in issuing the 2005 permit. Its decision is supported by the evidence in the record on review of the 2005 permit, specifically the documents submitted in the Village's application including Layne-Northwest's conclusion that Well No. 7, pumping at its full capacity, "would avoid any serious disruption of groundwater discharge to Lake Beulah." There is no concrete, scientific evidence in the record on review that would trigger the DNR's duty to consider the impact of Well No. 7 on waters of the state. Nor have the conservancies established that the DNR's decision to issue the 2005 permit violated any applicable requirements in Wis. Stat. § 281.34 or in the DNR rules. Thus, we must affirm the DNR's decision to issue the 2005 permit to the Village for Well No. 7.[42]

---

[42] We note that the Village has been operating Well No. 7 since August 1, 2008. *Lake Beulah Mgmt. Dist. v. Vill. of E. Troy*, 329 Wis. 2d 641, ¶ 3. The conservancies never requested a stay of the DNR's permit issuance at any point in the proceedings, in order to delay construction of Well No. 7 until after the review was complete. *See* Wis. Stat. § 227.54 (providing that a "reviewing court may order a stay upon such terms as it deems proper").

If the DNR or the conservancies believe that the well is *actually* causing harm to Lake Beulah, they are not foreclosed

## III. CONCLUSION

¶ 62. We conclude that, pursuant to Wis. Stat. § 281.11, § 281.12, § 281.34, and § 281.35, along with the legislature's delegation of the State's public trust duties, the DNR has the authority and a general duty to consider whether a proposed high capacity well may harm waters of the state. Upon what evidence and under what circumstances the DNR's general duty is implicated by a proposed high capacity well is a highly fact specific matter that depends upon what information is presented to the DNR decision makers by the well owner in the well permit application and by citizens and other entities regarding that permit application while it is under review by the DNR.

¶ 63. We further hold that to comply with this general duty, the DNR must consider the environmental impact of a proposed high capacity well when presented with sufficient concrete, scientific evidence of potential harm to waters of the state. The DNR should use both its expertise in water resources management and its discretion to determine whether its duty as trustee of public trust resources is implicated by a proposed high capacity well permit application, such that it must consider the environmental impact of the

by our decision from pursuing a remedy in the future through an enforcement or nuisance action. *See* Wis. Stat. § 30.03(4)(a) (authorizing the DNR to pursue relief regarding "a possible infringement of the public rights relating to navigable waters"); *State v. Michels Pipeline Constr., Inc.,* 63 Wis. 2d 278, 217 N.W.2d 339 (1974) (recognizing that the State may pursue an action to abate a public nuisance caused by groundwater use); *Gillen v. City of Neenah,* 219 Wis. 2d 806, 828–33, 580 N.W.2d 628 (1998) (holding that citizens may bring an action under Wis. Stat. § 30.294 to abate a public nuisance that is affecting public rights in navigable waters).

well or in some cases deny a permit application or include conditions in a well permit.

¶ 64. Thus, we affirm that part of the court of appeals decision holding that the DNR has the authority and a general duty, which it described as something less than an absolute duty, to consider the impact of a proposed high capacity well on waters of the state.[43] We further affirm the court of appeals' conclusion that this general duty requires the DNR to investigate or consider potential harm to waters of the state only when such duty is triggered, and that there are limited ways in which citizens may present evidence of potential harm to the DNR.[44]

¶ 65. However, we reverse that part of the court of appeals decision that reversed and remanded to the circuit court with directions to remand to the DNR. That part of the court of appeals decision was based on the court of appeals' conclusion that the DNR's duty was triggered in this case by the conservancies' submission of an affidavit by geologist Robert J. Nauta (the Nauta affidavit) to the DNR's in-house attorney regarding a related proceeding.[45] The court of appeals assumed that the DNR's attorney was not one of the decision makers and used the principles of attorney-client imputation—imputing the DNR attorney's possession of the Nauta affidavit to the DNR decision makers—to conclude that the decision makers had this information while reviewing the 2005 permit application and to include it in the record on review.[46] The

---

[43] *Lake Beulah Mgmt. Dist. v. DNR,* 327 Wis. 2d 222, ¶¶ 17–30.

[44] *Id.,* ¶¶ 29–34.

[45] *Id.,* ¶¶ 35–39.

[46] *Id.,* ¶¶ 34–38.

record is silent regarding who the DNR decision makers were and whether they actually had the Nauta affidavit while reviewing the 2005 permit application. Based on the lack of information on these matters in the record on review, we must reverse the court of appeals decision to remand to the circuit court with directions to remand to the DNR.

¶ 66. We note that the right to review of the DNR's decision regarding a high capacity well permit application "is dependent upon strict compliance with [Wis. Stat. ch. 227]."[47] "Ch. 227 provides a comprehensive, fully defined, procedure for judicial review of administrative decisions."[48] In a challenge to a DNR decision, "[d]eveloping a factual record . . . is essential, because [§ 227.57] limits judicial power over administrative decisions to review of the agency's actions, based on the record developed before the agency."[49] In this case, based on the record on review, which does not include the Nauta affidavit, the DNR was not presented with sufficient concrete, scientific evidence of potential harm to waters of the state, and thus, we affirm the DNR's decision to issue the 2005 permit.

¶ 67. Therefore, we affirm in part and reverse in part the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed in part and reversed in part.

¶ 68. ANNETTE KINGSLAND ZIEGLER, J. (*concurring*). I join the majority opinion because its holding is the legally correct result. Given that our review "shall

---

[47] *Cudahy*, 66 Wis. 2d at 259; *see also Kegonsa Joint Sanitary Dist.*, 87 Wis. 2d at 145.

[48] *Wis. Envtl. Decade, Inc. v. PSC*, 79 Wis. 2d at 170.

[49] *Charter Mfg. Co.*, 102 Wis. 2d at 527–28.

be confined to the record," Wis. Stat. § 227.57(1), I simply cannot dissent. Still, I write separately to express my uneasiness with the result in this case. Notwithstanding our decision today, there remains credible, concrete evidence that Well No. 7, now constructed and in operation since August 1, 2008, has the potential to harm the wetland and navigable surface waters of Lake Beulah. If the Wisconsin Department of Natural Resources (DNR) was not aware of this evidence then, it most certainly is aware now. However, such evidence is not part of the record for purposes of judicial review, and consequently, we may not consider it. Although this case does not sit well with me, this court cannot *sua sponte* supplement the record and permit the end to justify the means.

¶ 69. The waters of this state are deeply revered, especially by those who live alongside them. As the late Justice William A. Bablitch so eloquently observed, "Fishing is many things, the least of which to many who indulge is the catching of fish." *Cnty. of Adams v. Romeo,* 191 Wis. 2d 379, 391, 528 N.W.2d 418 (1995) (Bablitch, J., concurring in part, dissenting in part).[1] Well over a century ago, this court recognized one of the

---

[1] Justice Bablitch continued:

It is, in the winter doldrums, the casual browsing through the fishing catalogues, the fisherperson's equivalent of the gardener's seed catalogues, contemplating the coming renewal;

It is the snap of a twig across the lake on a dew filled morning signalling the approach of a deer taking the first sip of the dawn;

It is the desolate cry of a loon signalling its mate in a most haunting communion indecipherable to mere humans;

It is the screech of the owl ten feet above the river bend warning the invader of its displeasure as we approach at dusk to witness the fleetingly hypnotic hatch of the mayfly, ironically renewing itself at the moment of its demise;

unique and most significant rights enjoyed by riparian landowners: "The right of the riparian owner to the natural flow of water substantially unimpaired in volume and purity is one of great value, and which the law nowhere has more persistently recognized and jealously protected than in Wisconsin." *Winchell v. City of Waukesha*, 110 Wis. 101, 108, 85 N.W. 668 (1901). This is the very right that is potentially threatened by Well No. 7. According to Wisconsin licensed geologist Robert J. Nauta (Nauta), water pumped from Well No. 7 disrupts groundwater supply to Lake Beulah and diverts surface water from Lake Beulah, thereby adversely affecting the lake and the wildlife dependent upon the lake. *See also* Ken Bradbury & Jim Krohelski, *Groundwater Use and its Consequences in Wisconsin*, Groundwater Advisory Committee (Apr. 1, 2005), http://dnr.wi.gov/org/water/dwg/gac/minutes/GAC040105min.pdf; http://www.dnr.state.wi.us/org/water/dwg/gac/presentations/bradbury 040105.pdf.

¶ 70. However, the fact of the matter is that Nauta's affidavit is not part of the record for purposes of our review. *See* majority op., ¶¶ 57–58. Moreover, there is nothing in the record indicating that the DNR decision makers possessed the affidavit. *See id.*, ¶ 6; *Lake Beulah Mgmt. Dist. v. DNR*, 2010 WI App 85, ¶¶ 15, 35, 327 Wis. 2d 222, 787 N.W.2d 926. Because that evidence is not part of the record, I simply cannot conclude that the DNR erroneously exercised its discre-

---

It is the swish swish swish of the giant wings of the heron as it rises reluctantly from its shallow water preserve, glaringly reminding us that this is its home, not ours.

It is all of this, and more, that brings us back again and again. *This* is fishing; the catching of a fish is merely ancillary.

*Cnty. of Adams v. Romeo*, 191 Wis. 2d 379, 391–92, 528 N.W.2d 418 (1995) (Bablitch, J., concurring in part, dissenting in part).

tion when it issued the 2005 permit to the Village of East Troy for Well No. 7 without investigating or considering potential harm to Lake Beulah. *See* Wis. Stat. § 227.57(6) (providing that the court has the authority to "set aside agency action or remand the case to the agency if it finds that the agency's action depends on any finding of fact that is not supported by substantial evidence *in the record*" (emphasis added)).

¶ 71. Accordingly, I respectfully concur.