COURT OF APPEALS
DECISION
DATED AND FILED

November 4, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP1256**

**STATE OF WISCONSIN**

Cir. Ct. No. 2019CV2237

**IN COURT OF APPEALS
DISTRICT IV**

BENJAMIN M. DYKMAN,

PETITIONER-APPELLANT,

V.

BOARD OF REGENTS OF THE UNIVERSITY OF WISCONSIN,

RESPONDENT-RESPONDENT.

APPEAL from an order of the circuit court for Dane County: STEPHEN E. EHLKE, Judge. *Affirmed*.

Before Blanchard, P.J., Fitzpatrick, and Graham, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM. Benjamin Dykman seeks judicial review of a decision by the provost of the University of Wisconsin, which affirmed a decision by the university's office of compliance, which denied Dykman's disability discrimination complaint. In this appeal, Dykman purports to assert up to twenty separate issues for our review, and he makes wide-ranging allegations of impropriety against the university's department of psychology, the office of compliance, the provost, and the circuit court. At bottom, Dykman asks us to conclude that the department changed his employment classification in March 2014 because of a perceived disability. He also asks us to relieve him of obligations he assumed under an agreement that he reached with the department in November 2014 to resolve an earlier grievance he filed based on the same adverse employment decision and nearly identical facts. We reject Dykman's arguments and affirm the circuit court, which affirmed the provost's decision.

## BACKGROUND

¶2    This is a review of an agency action decision pursuant to WIS. STAT. § 227.52 (2019-20),[1] and our review is limited to the provost's decision denying Dykman's discrimination complaint. Nevertheless, because Dykman's employment history and prior grievances are pertinent to the current dispute, we include background facts about these topics.

¶3    Dykman held a position as a senior lecturer in the university's department of psychology for approximately eighteen years until his retirement in December 2017. As of 2014, he had a one-year "rolling horizon" appointment.

_____

[1] All references to the Wisconsin Statutes are to the 2019-20 version.

As we understand it based on the parties' submissions, a rolling horizon appointment is a limited form of job protection. Each day that Dykman enjoyed this appointment classification, he was guaranteed one year of lecturing commitments beyond that date.

¶4    In March 2014, the department revoked Dykman's rolling horizon appointment and changed his employment classification to a one-year, fixed-term renewable appointment. This decision to change Dykman's employment classification was made during a closed session of the department's executive committee, which we refer to as the "March 2014 meeting." The department communicated its decision to Dykman by letter, providing specific performance-based reasons for the decision.

¶5    Dykman promptly challenged the revocation of his rolling horizon appointment by filing a grievance with the university's academic staff appeals committee (ASAC). For ease of reference, we refer to this as Dykman's "first grievance." In his first grievance, Dykman contested the process that was used and conclusions that were reached during the March 2014 meeting. Among other things, he argued that the performance-based reasons given by the department were "unfounded or grossly exaggerated" and did not "warrant a change" in his appointment. He also asserted that "[s]erious, emotionally charged, unfounded defamation" of his character occurred at the March 2014 meeting, including a comment by one colleague that a second colleague said that Dykman "fit the profile of a very dangerous person."

¶6    Several months later, the department's executive committee voted to reconsider its prior action and reinstate Dykman's one-year rolling horizon appointment, contingent upon Dykman withdrawing his first grievance and

entering into a "binding retirement agreement" with the department. Following that vote, Dykman negotiated and signed a written agreement, which we refer to as the "November 2014 agreement." The November 2014 agreement provided in pertinent part as follows:

> Absent cause for dismissal, nonrenewal or layoff that would apply to any University Instructor, [Dykman] shall hold [his] appointment, as Senior Lecturer for three (3) years, beginning January 2015, and until [his] resignation and retirement in December 2017. The agreement to separate from employment with the Department no later than December 2017 shall be binding except in the event that the University offers to extend [his] employment and [he] agree[s] to such an extension.

¶7 In June 2016, approximately nineteen months after he signed the November 2014 agreement, Dykman filed another grievance with ASAC, which we refer to as his "second grievance." In his second grievance, Dykman again challenged the performance-based reasons given for changing his employment classification during the March 2014 meeting. He also sought to avoid his obligations under the November 2014 agreement (that is, what he referred to as his upcoming "forced retirement"), arguing that he had been forced to agree to terms he did not like based on an "unfounded, capricious, and arbitrary evaluation" of his teaching ability. According to Dykman, the issues he was "raising and seeking to settle" in his second grievance were "different" from the issues he raised and settled in his first grievance. Specifically, he stated that "needless, unfair and harmful wrongdoing and defamation of character" occurred during the November 2014 meeting, and he demanded that certain colleagues be disciplined for their comments. Again, among the alleged defamatory remarks listed in Dykman's second grievance was the assessment that he "fit the profile of a very dangerous person."

¶8      ASAC issued a decision dismissing Dykman's second grievance as untimely.  As ASAC explained, "[t]he vast majority of instances" that Dykman cited in his second grievance "were related to the instances addressed and resolved" in the November 2014 agreement, and the remaining instances post-dating November 2014 were "non-employment issues."

¶9      In December 2017, Dykman sought reconsideration of ASAC's dismissal of his second grievance based on "new evidence."  This purported new evidence consisted of an audio recording of the March 2014 meeting.  ASAC declined to accept the recording as new evidence or reconsider its decision.  Nothing in the administrative record suggests that Dykman sought administrative or judicial review of ASAC's decisions dismissing his second grievance and denying his request for reconsideration.

¶10     Dykman resigned and retired on December 31, 2017.

¶11     Then, in February 2018, Dykman filed a complaint with the university's office of compliance, in which he alleged perceived disability discrimination and sought to nullify the November 2014 agreement.  The audio recording of the March 2014 meeting was the centerpiece of Dykman's complaint.[2]  He argued that the audio recording, which included comments from colleagues stating that Dykman was "violence prone" and that he may have

---

[2] The audio recording of the March 2014 meeting is not found in the administrative record; however, the record does contain a so-called "verbatim" transcript of that recording.  There are reasons to question the completeness and accuracy of the transcript.  Not only is it not certified as having been prepared by a court reporter or other professional, but also, whoever prepared it apparently omitted some portions of the discussion and annotated other portions with extraneous commentary.  Nevertheless, for purposes of our review, we assume without deciding that the transcript contains an accurate representation of at least some of what was said during the March 2014 meeting.

suffered "neurological" difficulties or damage after a bike accident, demonstrated that his appointment had been revoked due to a perceived disability. According to Dykman, he should not be bound by the November 2014 agreement based on the following string of propositions: if the department had not subjected him to perceived disability discrimination during the March 2014 meeting, the committee would not have revoked his rolling horizon appointment, he would not have filed his first grievance, and there would have been no occasion to enter into his November 2014 agreement in which he settled that grievance by committing to a December 2017 retirement date.

¶12    Following a lengthy formal investigation, the office of compliance denied Dykman's disability claim. Among other things, it determined that the department did not coerce Dykman into entering the November 2014 agreement, that the November 2014 agreement was legally binding, and that Dykman was estopped from challenging the agreement after receiving its full benefit.[3] The office of compliance also determined that Dykman's challenges to the March 2014 revocation decision and the November 2014 agreement were untimely and, further, that the recording did not constitute new evidence because Dykman had generally been aware of its contents at the time he filed his earlier grievances. Finally, the office of compliance determined that Dykman failed to prove that the department changed his employment classification due to a perceived disability. After "multiple reviews" of the audio recording, the office of compliance found that the department revoked Dykman's appointment due to his history of poor teaching performance, low enrollments, and unacceptable treatment of students. It

---

[3] The provost determined that the agreement resulted in a salary increase in Dykman's final three years of employment and increased benefits upon retirement.

6

found that the discussion during the meeting of his allegedly erratic and threatening behavior was related to safety concerns about how the department would communicate the adverse employment decision to Dykman.

¶13 Dykman appealed to the provost, who upheld the decision by the office of compliance. The provost emphasized that Dykman had been aware that some members of the committee perceived him as dangerous even before he filed his first grievance and, further, that "there is nothing in the [audio] recording that demonstrates that the action of removing [his] Rolling Horizon appointment was based on perceived disability." To the contrary, the provost found that the recording demonstrates that the "primary concern" motivating the revocation decision "related to [Dykman's] history of academic performance-related concerns." The provost explained that "a discussion about someone's potential emotional and physical response to a negative employment decision is not the equivalent of disability discrimination."

¶14 Dykman filed a pro se petition for judicial review in the circuit court, naming the University of Wisconsin Board of Regents as the respondent. *See* WIS. STAT. § 227.52. In the petition, he contested the March 2014 change in his employment classification, and he argued that he had been "misled and coerced" into signing the November 2014 agreement. The circuit court dismissed the petition for review. Dykman appeals.

## DISCUSSION

¶15 In an appeal of a circuit court's decision regarding a WIS. STAT. ch. 227 petition for judicial review, we review the decision made by the administrative agency rather than the decision rendered by the circuit court. *Myers v. DNR*, 2019 WI 5, ¶17, 385 Wis. 2d 176, 922 N.W.2d 47. We begin our

discussion by addressing a threshold issue related to the contents of the administrative record. We then address the merits of Dykman's petition.

## I

¶16 WISCONSIN STAT. ch. 227 judicial review is normally confined to the record compiled by the agency. WIS. STAT. § 227.57(1). In some circumstances, a court may consider evidence outside the administrative record for limited purposes. *Id.*; *see also* WIS. STAT. § 227.56(1); *Lake Beulah Mgmt. Dist. v. DNR*, 2011 WI 54, ¶53, 335 Wis. 2d 47, 799 N.W.2d 73.

¶17 During the circuit court proceedings in this case, Dykman cited alleged "irregularities" that occurred during the March 2014 meeting, and he asked the court to allow for civil discovery and to schedule an evidentiary hearing to determine, among other things, the truth of his former colleague's assertion that he was a "violence prone" individual. The Board of Regents opposed this motion. Dykman then notified the circuit court of his belief that the administrative record was "incomplete." *See* WIS. STAT. § 227.55(1) (providing that administrative agencies are to submit the "entire record" to the reviewing court, and the reviewing court "may require or permit subsequent corrections or additions to the record when deemed desirable"). The circuit court ultimately dismissed Dykman's petition without expressly deciding his motion seeking discovery and an evidentiary hearing, and without addressing his assertion that materials were missing from the administrative record.

¶18 Prior to filing his opening brief in this court, Dykman filed a motion asking this court to supplement the administrative record. He argued that the office of compliance and the provost considered certain materials that were not

included in the record submitted by the Board of Regents, and that these materials should be added to the administrative record.

¶19     We denied Dykman's motion to supplement the record in an order dated December 29, 2020.  In so doing, we stated that "deciding whether the record was incomplete will require the court to become familiar with the agency decision and the issues to be argued on appeal," and that it is "more efficient for the court to do that only once, in the context of reviewing briefs that address all of those issues together."  We further stated that, if Dykman's assertion that additional materials should be included in the administrative record is correct, we may decide that "judicial efficiency would be better served by having the material added to the record and continuing with the appeal," rather than remanding the case to the circuit court for supplementation.  The clear implication of our order was that, if Dykman continued to maintain that certain materials should have been included in the administrative record, he should include factual and legal arguments to that effect in his appellate briefing.

¶20     It is apparent that Dykman misconstrued our order.  Based on his appellate submissions, he took the position that we granted his motion to supplement the record.  Without further argument, he filed an appendix containing a number of materials that are not contained in the administrative record.

¶21     In the course of considering how to address Dykman's misconstruction of our order and his submission of documents not contained in the administrative record, we reviewed the extra-record materials submitted in Dykman's appendix, as well as other extra-record materials that he submitted to the circuit court along with his petition for judicial review.  Some of the materials post-date the provost's decision and are, on their face, inappropriate candidates for

record supplementation. It is not apparent whether other materials were actually submitted to the office of compliance or the provost during the administrative proceedings. Nevertheless, having reviewed these materials, we can confidently state that none of these materials would alter any of the conclusions we reach below.

## II

¶22 We now turn to the provost's decision. On review, we will affirm the decision "[u]nless [we] find[] a ground for setting aside, modifying, remanding or ordering agency action." WIS. STAT. § 227.57(2). The petitioner bears the burden of demonstrating that the agency's decision should be set aside or modified. *Bethards v. DWD*, 2017 WI App 37, ¶16, 376 Wis. 2d 347, 899 N.W.2d 364. We review an agency's conclusions of law de novo, *Tetra Tech EC, Inc. v. DOR*, 2018 WI 75, ¶84, 382 Wis. 2d 496, 914 N.W.2d 21, and we will set aside or modify the agency's decision if "the agency has erroneously interpreted a provision of law and a correct interpretation compels a particular action[.]" *See* § 227.57(3).[4] If the agency's decision depends on facts determined without a hearing, we will set aside or modify the agency's decision "if the facts compel a particular action as a matter of law[.]" *See* § 227.57(7).

---

[4] The Board of Regents argues that we should afford due weight to the provost's experience, technical competence, and specialized knowledge, particularly in matters involving university personnel decisions. Dykman disagrees. We need not decide whether we would afford due deference in this case because doing so would not alter our conclusions. *See Barrows v. American Fam. Ins. Co.*, 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d 508 (2013) (we need not address issues that are not dispositive).

¶23    Here, we conclude that the provost's decision should be affirmed for at least two reasons, either of which is sufficient to reject Dykman's appeal.[5]

¶24    First, we agree with the provost's conclusion that Dykman's current challenges to the employment classification decision made at the March 2014 meeting and the November 2014 agreement are untimely.  In its appellate briefing, the Board of Regents asserts that the university's internal policies require discrimination complaints to be filed with the office of compliance within 300 days of the alleged act of discrimination, and Dykman does not dispute this limitations period.  Here, the allegedly discriminatory act occurred during the department meeting in March 2014, and Dykman filed his complaint more than three years after that act.  Dykman argues that he did not discover that the department's decision was motivated by perceived disability discrimination until he listened to an audio recording in October of 2017, yet he cites no legal authority

---

[5] Dykman's appellate briefing purports to address twenty separate issues.  We note that his briefing stretches our appellate rules beyond recognition by including (but not counting for purposes of the word limit) an argumentative sixteen-page discussion of the "issues presented for review" in his eighty-two-page opening brief.  *See* WIS. STAT. § 809.19(8)(c).

As for the arguments that we do not otherwise address in this opinion, we specifically reject Dykman's arguments about the department's failure to follow Robert's Rules of Order during the March 2014 meeting and the applicability of WIS. STAT. § 12.09 to that meeting.  We likewise reject Dykman's argument that he identified procedural irregularities in the proceedings before the office of compliance or the provost that would entitle him to discovery or an evidentiary hearing on judicial review.  *See* WIS. STAT. § 227.57(1); *see also* ***Lake Beulah Mgmt. Dist. v. DNR***, 2011 WI 54, ¶53, 335 Wis. 2d 47, 799 N.W.2d 73.  To the extent that Dykman complains about procedural irregularities in the circuit court, they are immaterial because we review the provost's decision, rather than the decision of the circuit court.  ***Myers v. DNR***, 2019 WI 5, ¶17, 385 Wis. 2d 176, 922 N.W.2d 47.  We also reject Dykman's assertion that an initial determination of probable cause issued by the Wisconsin Equal Rights Division in a separate administrative proceeding is precedential authority that is binding on this court.  Finally, to the extent Dykman advances other arguments in his appellate briefing that are not specifically commented on, we reject them because they do not warrant a response.  *See* ***State v. Pettit***, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992) (we need not consider arguments that are inadequately supported by factual and legal citations or are undeveloped).

11

for the proposition that the university recognizes a discovery rule that would toll his filing deadline until his subsequent discovery of the recording. Accordingly, we conclude that Dykman has not demonstrated that the provost's decision should be modified or set aside based on an erroneous interpretation of any provision of law. WIS. STAT. § 227.57(3).

¶25    Second, even if we were to overlook the untimeliness of his discrimination complaint, Dykman does not demonstrate that there are grounds to set aside the provost's determination on the merits. Before explaining this conclusion, we briefly comment on the scope of our review.

¶26    According to the transcript Dykman provided, the department identified multiple performance-based reasons during the March 2014 meeting that supported its decision to change Dykman's employment classification.[6] In his appellate briefing, Dykman argues that these performance-based reasons are not supported by "substantial evidence in the record." We do not address these and similar arguments because they are beyond the scope of our current review. Dykman's assertion that the department lacked cause to change his employment classification was *not* a new issue raised for the first time in the complaint he filed with the office of compliance—that assertion was the subject of both of Dykman's prior grievances. Instead, the new issue raised by his complaint was his assertion that the department changed his employment classification because of perceived disability discrimination. We therefore limit our review to that issue.

---

[6] These reasons included the following allegations: "minimally acceptable" student evaluations; low course enrollments; student complaints relating to Dykman's teaching and interactions; Dykman's unwillingness to revise his syllabus, his unwillingness to accept different course assignments; and continued poor performance despite clear and consistent feedback.

¶27  The Board of Regents explains that, to maintain an employment discrimination claim under the Americans with Disabilities Act, Dykman must prove that he "has been subjected to an action prohibited [by that Act] because of an actual or perceived physical or mental impairment …."  42 U.S.C. § 12102(3)(A) (2021).  Similarly, the Wisconsin Fair Employment Act prohibits employment discrimination "because of" a perceived impairment.  *See* WIS. STAT. § 111.32(8).

¶28  Here, the provost found that "there is nothing in the [audio] recording that demonstrates that the action of removing [Dykman's] Rolling Horizon appointment was based on perceived disability."  Having thoroughly reviewed the transcript provided by Dykman, we conclude that it supports the provost's finding of fact, and that the facts do not compel a contrary finding.  *See* WIS. STAT. § 227.57(7).  To be sure, during the department's lengthy discussion (which, according to Dykman, lasted nearly an hour), there were two isolated comments referencing a bike accident, and two isolated comments asserting that Dykman may have suffered neurological difficulties or damage.  However, the transcript supports the provost's determination that the evidence is insufficient to show that these comments were a "motivating factor" leading to the decision to revoke his appointment.

¶29  Turning to the comment made at the meeting that appears to be the focus of Dykman's argument—that he "show[ed] the profile of somebody who is very violence prone"—the transcript unequivocally demonstrates that this comment was made in the context of concerns about the "welfare of the people

making these decisions."[7]  The provost did not err as a matter of law when he explained that "a discussion about someone's potential emotional and physical response to a negative employment decision is not the equivalent of disability discrimination."

¶30    Accordingly, Dykman fails to demonstrate that the facts of record compel the conclusion that the department made its decision to change his employment classification because of a perceived disability.

## CONCLUSION

¶31    For the reasons stated above, Dykman does not persuade us that there are grounds to set aside or modify the provost's decision.

*By the Court.*—Order affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)5.

---

[7] Specifically, the transcript reveals that committee members discussed an incident in which Dykman's behavior was perceived as threatening to the chair of the department, and another incident in which his behavior was perceived as threatening to a student.  One member of the community expressed concern for the "security" of the chair and associate chair and said, "we want to know how you're being protected."